CHARLES B. KIRBY ET. AL., APPELLANTS, V. OMAHA BRIDGE COMMISSION ET AL., APPELLEES.

FILED JUNE 13, 1934. No. 29144.

*James E. Rait,* for appellants.

*Seymour L. Smith, Kenneth S. Finlayson* and *L. J. Te-Poel, contra.*

Heard before ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and LESLIE and RYAN, District Judges.

EBERLY, J.

This suit was instituted by Charles B. Kirby and Elizabeth J. Lindsey, resident taxpayers of the city of Omaha,

against the city of Omaha and certain individuals named who are members of the city council thereof, Roy N. Towl as mayor thereof and *ex officio* member of the Omaha bridge commission, the Omaha bridge commission, a corporation organized and existing under and by virtue of chapter 14, art. 12, Comp. St. 1929, and the individuals named as members constituting the same, as in the amended petition set forth. So far as we are concerned with this pleading on appeal, we are confined to the substance thereof, as stated in appellants' brief, viz., "that the defendants will, unless enjoined, issue $1,650,000 in bonds of the city of Omaha, or so much as may be necessary, and will sell the same to the United States of America and with the proceeds thereof will proceed with the erection of a bridge across the Missouri river at South Omaha, Nebraska;" further, that "these bonds purport to be revenue bonds payable solely out of revenues to be derived from tolls charged for the use of the bridge (so constructed), but plaintiffs say such tolls will be insufficient and that the obligation imposed upon the city of Omaha by the laws of Nebraska and the act of congress under which the bridge is to be erected require the city of Omaha to obtain a fund sufficient to amortize said bonds, and that, in the event that such funds are insufficient, the bonds will then become a general liability and obligation of the city of Omaha."

The intent of the proper authorities to issue and sell the bonds to the extent and for the purpose alleged is admitted in the answer, but the additional allegations contained in the petition are denied by the defendants. The issue thus presented is, in substance, will the "revenue bonds" of the city of Omaha, if issued as contemplated, constitute the general obligation of the city of Omaha?

There was a trial on the merits in the district court for Douglas county, which resulted in a decree finding "generally in favor of the defendants upon all issues presented," and further finding "that the proposed construction of the bridge across the Missouri river, as shown by

the pleadings and the evidence, will not involve any illegal expenditure of the public money of the city of Omaha, and said construction of the proposed bridge will not create a general liability or obligation of the city of Omaha for the payment of the bonds to be issued therefor, and that said bonds in the manner and form in which they are proposed to be authorized and issued do not become a general obligation of the city of Omaha." Plaintiffs' cause of action was thereupon dismissed, and they appeal.

The limitation of the issue for decision, as above suggested, is required. For, while it is the undoubted rule that, "when bonds or other evidences of indebtedness are about to be issued by public officers illegally or without complying with the statute authorizing their issue, equity has jurisdiction to grant an injunction," still, "to entitle a taxpayer or other person to sue for such an injunction he must show that he is interested in the matter and will be damaged if the improper acts are not prevented by injunction, and that he has no other adequate remedy." 32 C. J. 268.

These principles may be said to be in harmony with the pronouncements of this court in a similar class of taxpayers' suits involving analogous if not identical issues, wherein we have approved as a general doctrine the following: "A private person seeking the aid of equity to restrain an act of a municipal body must show some special injury peculiar to himself aside from and independent of the general injury to the public, which either entails an illegal expenditure of public funds or involves an illegal increase in the burden of municipal taxation. *Chizek v. City of Omaha*, 126 Neb. 333; *Kittle v. Fremont*, 1 Neb. 329; *Shed v. Hawthorne*, 3 Neb. 179; *Ray v. Colby & Tenney*, 5 Neb. (Unof.) 151; *Hill v. Pierson*, 45 Neb. 503; *Clark v. Interstate Independent Telephone Co.*, 72 Neb. 883; *George v. Peckham*, 73 Neb. 794; *Bischof v. Merchants Nat. Bank*, 75 Neb. 838; *Letherman v. Hauser*, 77 Neb. .731; *Lee v. City of McCook*, 82 Neb. 26;

*Woods v. Lincoln Traction Co.,* 83 Neb. 23; *Gleason v. Loose-Wiles Cracker & Candy Co.,* 88 Neb. 83; *Powers v. Flansburg,* 90 Neb. 467; *Brown v. Easterday,* 110 Neb. 729; *World Realty Co. v. City of Omaha,* 113 Neb. 396.

Nor are the principles thus announced in any manner inconsistent with *Interstate Power Co. v. City of Ainsworth,* 125 Neb. 419, or *Carr v. Fenstermacher,* 119 Neb. 172. The point here under consideration was not formally discussed in either of these decisions. It may be noted, however, that in the *City of Ainsworth* case it is stated in the opinion that the plaintiff, Interstate Power Company, "is a taxpayer in the defendant city, in which it owns and operates an electric distribution system." As owner of a competing business it was thus threatened with an injury peculiar to itself. For reasons set forth in that opinion, it was as such accorded full relief. In the *Fenstermacher* case the two plaintiffs allege, as their qualifications to bring the action, "that they are resident taxpayers and users of electricity furnished by means of the plant." While it may be questioned whether these allegations are sufficient to disclose a threatened injury peculiar to themselves, and different from other taxpayers, the cause was considered on its merits and for reasons stated in the opinion relief was denied.

As a preface to our examination of the questions presented by this appeal, it may be said that this cause arises out of what is commonly known as the "United States recovery program." This program has for one of its objectives the providing of gainful employment for those who have been deprived of the opportunity to labor by the "depression." In it are involved the proper cooperation of the state and federal authorities to the end that by the construction of self-liquidating works of internal improvement people in want may receive the benefits that the public works administration was intended to assure. The legislative enactments involved, both federal and state, may rightfully be taken for the purposes of construction as highly remedial in their nature, and necessarily construed in that light.

During the year 1933 public works administration funds were allocated for the construction of this highway bridge by proper federal officials. The project was approved by both the Omaha bridge commission, hereinafter referred to as bridge commission, and also by the corporate authorities of the city of Omaha. On December 5, 1933, the city council of Omaha, by a unanimous vote, passed a resolution declaring its purpose to finance this project from the sale of "revenue bonds" to be authorized and issued pursuant to section 2, ch. 27, Laws 1931. This act in terms empowers the council of the city of Omaha, in its discretion, to issue revenue bonds payable solely from the earnings of the bridge to be constructed, without a vote of the electors, where, as in this case, such bridge is to be built more than a mile from an existing highway bridge, and which act also in terms negatives any general liability on or because of such bonds on the part of the city issuing the same. It may be stated that all steps required by legislation applicable to be taken by the parties concerned, to accomplish the construction of this proposed internal improvement, have been regularly taken up to and including the approval by the proper United States officials of certain plans, specifications, drawings, and maps of the location of this proposed bridge submitted to such officials for that purpose by the bridge commission as assignee of Charles B. Morearty.

The authority for the proposed construction of this bridge on the part of defendants is derived from chapter 176, Laws 1929, entitled "An act authorizing and empowering cities of the metropolitan class to acquire by purchase, condemnation, bargain and sale, lease, sublease, gift or otherwise, and to construct and contract for the construction of bridges or viaducts within the city limits and five miles outside thereof, within the state of Nebraska, and any adjoining states," etc. This act of 1929 was amended by the enactment of chapter 27, Laws 1931, which was duly passed and approved March 9, 1931. This legislation of 1929 provides for the creation of a bridge

commission, and it is not questioned that the Omaha bridge commission was properly created pursuant to its provisions.

Under the provisions of this enactment (Comp. St. 1929, sec. 14-1201) "Any city of the metropolitan class, including those governed under a home rule charter, is hereby authorized and empowered to acquire by purchase, condemnation, bargain and sale, lease, sublease, gift or otherwise; any existing bridge or viaduct including approaches and avenues, rights of way or easements of access to approaches, necessary real and personal property incident thereto and franchises, special privileges, leases and contracts in connection with such bridges or viaducts, and to so acquire any bridge or viaduct and aforesaid facilities and property constructed in the future; and is also authorized and empowered to construct and contract for the construction of, and to acquire by purchase, lease, sublease, gift or otherwise, bridges or viaducts including all of aforesaid appurtenances, facilities and property; and is also authorized and empowered thereafter to repair, maintain, extend, renew, reconstruct, replace or enlarge and to mortgage or lease and to use and operate any such bridges or viaducts as toll or free bridges, either or both from time to time," etc.

As to the exercise of the powers thus vested, it is provided (Comp. St. 1929, sec. 14-1202): "Any power in this act granted to such city may be exercised by the city independently or in cooperation with or aid of similar action by any other city or any county in Nebraska, or any city or county in an adjoining state, or the state of Nebraska, or any adjoining states, or state, or the government of the United States when such other political unit has been authorized by law to exercise the necessary powers. Such joint action may be directly by the governing body of the city through the medium of a joint bridge commission subject to the same conditions provided in this act for independent action."

The method of financing provided (Laws 1931, ch. 27, sec. 1) includes the following: "To finance any of the purposes or powers provided for in this act, the governing body of any such city shall in the first instance determine whether any purchase, condemnation or construction authorized by the act shall be financed by bonds which are general obligations of the city * * * or by revenue bonds as provided for in this act and which are charges solely against the revenue to be derived from such bridge through the collection of tolls, * * * provided, no election and no vote of electors shall be required upon the question of acquiring or constructing any bridge or issuing revenue bonds as authorized by this act, for the acquisition or construction of any bridge located more than one mile from any existing bridge, other than a railroad bridge, if the governing body of such city shall determine by a vote of a majority of its members to dispense with such election or vote of electors as to such question. This grant of power to issue bonds is in addition to any other power which may now have been or hereafter may be conferred upon such city, and shall be free from the restrictions now imposed by the charter of the city upon the issuance of bonds and incurring of indebtedness, and subject only to the provisions of the Constitution of Nebraska. * * * For all purposes of financing, the total cost of any improvement authorized by this act may include every item of expense in connection with the project, and among other items shall also include the cost of acquiring every interest of every nature and of every person in any existing bridge, the cost of constructing the superstructure, roadway and substructure of any bridge, the approaches and avenues or rights of way of access thereto and necessary real estate in connection therewith, toll houses and equipment thereof and of the bridge, franchises, easements, rights or damages incident to or consequent upon the complete project expenses preliminary to construction, including investigation and expenses incident thereto, and prior to and during construc-

tion the proper traffic estimates, interest upon bonds and all such other expenses as after the beginning of operation would be properly chargeable as cost of operation, maintenance and repairs."

In addition, section 14-1210, Comp. St. 1929, as amended in 1931 (Laws 1931, ch. 27, sec. 2), provides in part: "Cities of the metropolitan class are hereby authorized to provide funds for the purposes of this act by the issuance of revenue bonds of such cities, the principal and interest of which bonds shall be payable solely from the special funds herein provided for such payment and as to which, as shall be recited therein, the city shall incur no indebtedness of any kind or nature and to support which the city shall not pledge its credit nor its taxing power nor any part thereof. * * * Provided, no election and no vote of electors shall be required upon the question of acquiring or constructing any bridge or issuing revenue bonds as authorized by this act, for the acquisition or construction of any bridge located more than one mile from any existing bridge, other than a railroad bridge, if the governing body shall determine by a vote of a majority of its members to dispense with such election or vote of electors as to such question. * * * The bonds authorized by this section may, at the option of the governing body of such city, be supported by mortgage or by deed of trust."

It is obvious that the statutory provisions above quoted fully authorize the acts of the city sought to be enjoined, and what has been done by the defendants, as shown by the record, finds ample justification, not only in the portions quoted, but by the entire enactment as amended.

However, by the provisions of an act of congress, entitled "An act to authorize the construction of certain bridges and to extend the times for commencing and completing the construction of other bridges over the navigable waters of the United States," approved June 10, 1930, it is provided that "Charles B. Morearty, his heirs, legal representatives, and assigns, be, and is hereby,

authorized to construct, maintain, and operate a bridge and approaches thereto across the Missouri river, at a point * * * at or near South Omaha, Nebraska," etc. (Public document No. 330.) Section 4 (g) of this act also provided: "The right to sell, assign, transfer, and mortgage all the rights, powers, and privileges conferred by this act is hereby granted to Charles B. Morearty, his heirs, legal representatives, and assigns; and any corporation to which or any person to whom such rights, powers, and privileges may be sold, assigned, or transferred, or who shall acquire the same by mortgage foreclosure or otherwise, is hereby authorized and empowered to exercise the same as fully as though conferred herein directly upon such corporation or person."

All rights created by this federal legislation and vested in Charles B. Morearty have been transferred to the city of Omaha, which is proceeding to the construction of the bridge as already indicated. These instruments of conveyance are unchallenged as to form, and questioned only because of alleged incompetency of the city of Omaha to accept and take thereunder.

Appellants contend that all sections of this bridge act authorizing the issuance of "revenue bonds" and providing that they "are charges solely against the revenue to be derived from such bridge through the collection of tolls" (Comp. St. 1929, sec. 14-1209) and "shall be payable solely from the special funds herein provided for such payment and as to which, as shall be recited therein, the city shall incur no indebtedness of any kind or nature and to support which the city shall not pledge its credit nor its taxing power" (Comp. St. 1929, sec. 14-1210) are wholly void because irreconcilable with that part of section 14-1212, Comp. St. 1929, which provides that "a fund sufficient to pay the interest and principal of any bonds issued under this act" (and to amortize the same as required by the federal act) *shall be collected by the city*, for the reason that the portion of section 14-1212 above quoted is the last position of the state.

Conceding that, where there is an irreconcilable conflict between different sections of the same statute, the last words stand and those in conflict therewith are repealed (*Albertson v. State,* 9 Neb. 429; *Ryan v. State,* 5 Neb. 276), we are, however, here dealing with remedial legislation to be construed liberally. So construed, no irreconciliable conflict appears. The legislative subjects of sections 14-1209 and 14-1210, Comp. St. 1929, as originally enacted, relate to the method of the issuance of bonds by which the proposed bridge is to be financed. Section 14-1212, as originally passed in 1929, is confined to the rates of tolls, together with elements affecting the same. It also provides remedies for "owners of outstanding bonds issued to finance the bridge" in relation to the determination of tolls. These are all in addition to, but not necessarily in conflict with, the general provisions of sections 14-1209 and 14-1210, Comp. St. 1929. The rule is: "If possible, a statute should be so construed as to render it a consistent and harmonious whole; if different portions seem to conflict, they should, if practicable, be harmonized, that construction being favored which will render every word operative rather than one which makes some words idle and nugatory." 25 R. C. L. 1008, sec. 247.

But by an act embracing a comprehensive title, sections 14-1209 and 14-1210, Comp. St. 1929, and other sections of the act of 1929, were amended and substantially readopted by the legislature of 1931. See Laws 1931, ch. 27. Section 14-1212, Comp. St. 1929, remains as it was enacted in 1929. If we are mistaken in the conclusion just stated, and if sections 14-1209 and 14-1210, as now existing, are in fact repugnant to any of the provisions of section 14-1212, the controlling principle is that, where there are irreconcilable sections in the statutes, the later enactment will control. 59 C. J. 1052; *State v. Board of County Commissioners,* 109 Neb. 35.

Thus, appellants' contention as to the validity of the controlling statutory provisions is foreclosed by the history of the legislation.

It will be remembered that this record discloses that the intent and purpose of the city of Omaha, as appears from all proceedings taken or proposed, are that the principal and interest of the bonds issued to finance the construction of the proposed bridge shall be payable solely from the special funds created by the charging of tolls to the users of the bridge, and that the city shall and thereby does create no indebtedness of any kind or nature, and to support which the city shall not and does not pledge its taxing power nor any part thereof. This is within its statutory powers expressly granted. These terms, conditions and limitations will expressly appear on the face of the "revenue bonds" it proposes to issue and sell. In fact, in the absence of an authorization by the electorate, it is limited by the terms of the statute to the restricted action it proposes to take. Obviously, what is created is not a general obligation of the city, nor can the burden on the taxpayers be in any manner affected thereby. *Carr v. Fenstermacher,* 119 Neb. 172; *Peake v. New Orleans,* 139 U. S. 342; *Bates v. State Bridge Commission,* 109 W. Va. 186; *Alabama State Bridge Corporation v. Smith,* 217 Ala. 311; *State v. Moorer,* 152 S. Car. 455; *Barnes v. Lehi City,* 74 Utah, 321; *City of Winner v. Kelley,* 65 Fed. (2d) 955; *Franklin Trust Co. v. City of Loveland,* 3 Fed. (2d) 114; *Town of Windfall City v. First Nat. Bank,* 172 Ind. 679; *Quill v. City of Indianapolis,* 124 Ind. 292; *White River Savings Bank v. City of Superior,* 148 Fed. 1; *Winston v. City of Spokane,* 12 Wash. 524; *Meyer v. City and County of San Francisco,* 150 Cal. 131; *Baker v. City of Seattle,* 2 Wash. 576; *Village of Park Ridge v. Robinson,* 198 Ill. 571; *Searle v. Town of Haxtun,* 84 Colo. 494; *Shields v. City of Loveland,* 74 Colo. 27.

Lastly, we have carefully examined the contention of appellants that the city of Omaha is not a competent assignee of the "Morearty franchise," but are unable to accept their argument. The United States is not a challenging party. The words of the federal act, in connec-

tion with the context, we do not construe as limiting possible assignees to persons or private corporations. Under the statutes of our state, the city, and its bridge commission, or either of them, is expressly authorized to acquire the franchise to construct the bridge in question, without limitation as to the method by which such powers shall be exercised and the franchise secured. Therefore, they may legally acquire such franchise from a party, private or corporate, or from such party's assignee. 43 C. J. 1337; *Leeds v. City of Richmond,* 102 Ind. 372; 3 McQuillin, Municipal Corporations (2d ed.) sec. 1220.

The conclusion follows that the findings and judgment of the district court are in all respects correct, and are

AFFIRMED.