## STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS, ATTORNEY GENERAL, APPELLANT, V. NEBRASKA MORTGAGE FINANCE FUND, APPELLEE.

283 N. W. 2d 12

Filed August 21, 1979. No. 42733.

446

Paul L. Douglas, Attorney General, and Terry R. Schaaf, for appellant.

Terrence J. Ferguson and J. Thomas Marten of Kutak, Rock & Huie, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C. J.

This appeal, brought by the Attorney General of the State of Nebraska (State), attacks the constitutionality of the Nebraska Mortgage Finance Fund Act (Act), sections 76-1601 to 76-1651, R. S. Supp., 1978, enacted by the 1978 Legislature as L.B. 476. The trial court, after examining the various claims made by the State, determined that the Act was in all respects valid and not in violation of the Constitution of the State of Nebraska. In review of these matters, we concur with the trial court's finding that the Act does in all respects meet constitutional requirements, and accordingly affirm the judgment of the trial court.

The purpose of the Act is to assist private mortgage lenders in providing mortgage financing for single family residences at reduced interest rates for low and moderate income families through two programs. Under the "loans-to-lenders" program, section 76-1622, R. S. Supp., 1978, the Fund will make loans to mortgage lenders which will use the proceeds to make mortgage loans. Under the "mortgage purchase" program, section 76-1623, R. S. Supp., 1978, the Fund will purchase or take assignments of mortgage loans made by mortgage lenders for the construction, rehabilitation, or purchase of residential housing. Each program is intended to enable mortgage lenders to use a new source of capital solely for the purpose of making mortgage loans to persons otherwise unqualified for mortgage financing because of insufficient personal or family income. § 76-1606 (5), R. S. Supp., 1978.

The Fund will issue tax-exempt revenue bonds bearing interest at rates lower than the outstanding mortgages. The differential between the interest paid the Fund by mortgagors and the interest paid by the Fund to bondholders is expected to provide the margin to operate the mortgage programs established by the Act.

The Act itself is quite long and complete in operating detail but, in short, the principal function of the Fund is to issue tax-free revenue bonds and to use the proceeds either to encourage lenders to make lower interest loans to low or moderate income persons or in turn to purchase from lending institutions mortgages made to low or moderate income persons.

The Act creates "a body politic and corporate, not a state agency, but an independent instrumentality exercising essential public functions, to be known as the Nebraska Mortgage Finance Fund." § 76-1607, R. S. Supp., 1978. The Fund is composed of nine members; three are ex officio state officers and six are appointed by the Governor. § 76-1607 (2), R. S. Supp., 1978. The six public members, to the extent possible, represent all areas of the state, and not more than three public members may belong to the same political party. § 76-1607 (3), R. S. Supp., 1978.

The three ex officio state officers are the Director of Economic Development, the chairman of the Nebraska Investment Council, and the Director of Planning. The chairman of the Fund is the Director of Economic Development. The Fund members elect a vice chairman and such other officers as they may determine. Members of the Fund receive no compensation for their services but are reimbursed for expenses solely from revenue of the Fund in the same manner as the law provides for state employees.

In passing the Act, the Legislature set out a declaration of intent which provides: "It is hereby found and declared that: (1) From time to time the high rates of interest charged by mortgage lenders seriously restrict existing housing transfers and new housing starts and the resultant reduction in residential construction starts causes a condition of substantial unemployment and underemployment in the construction industry; and (2) Such condi-

tions generally result in and contribute to the creation of slums and blighted areas in the urban and rural areas of this state and a deterioration of the quality of living conditions within this state, and necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident prevention, and other public services and facilities." § 76-1602, R. S. Supp., 1978.

The Legislature further set out in clear and concise terms its findings which included the fact that there existed in the urban and rural areas of the state an inadequate supply of, and a pressing need for, sanitary, safe, and uncrowded housing at prices which persons of low and moderate income can afford, and as a result such persons are forced to occupy insanitary, unsafe, and overcrowded housing. § 76-1603, R. S. Supp., 1978. The Act further notes: "Such problems cannot alone be remedied through the operation of private enterprise or individual communities or both, but can be alleviated through the creation of a governmental body to encourage the investment of private capital and stimulate the construction of sanitary, safe, and uncrowded housing for low and moderate income persons through the use of public financing as provided by * * * [the Act] and loans at reasonable interest rates, and by coordinating and cooperating with private industry and local communities, which is essential to alleviating the foregoing conditions and is in the public interest." § 76-1604, R. S. Supp., 1978.

In particular, the Legislature found that "[a]lleviating such conditions and problems through such encouragement of private investment and stimulation of construction by a governmental body is a public purpose and use for which public money provided by the sale of revenue bonds may be borrowed, expended, advanced, loaned, or granted. Such activities shall not be conducted for profit." In conclud-

ing its intent, the Legislature said: "Such activities are proper governmental functions and can best be accomplished by the creation of a governmental body vested with the powers and duties specified in * * * [the Act]. The necessity for the provisions of sections 76-1601 to 76-1651 to protect the health, safety, morals, and general welfare of all the people of this state is hereby declared as a matter of legislative determination. The governmental body created by sections 76-1601 to 76-1651 shall make financing available for new or existing housing to serve those people which private industry is unable to serve at current interest rates." § 76-1605, R. S. Supp., 1978.

These legislative findings are reinforced by testimony and documents submitted at hearings conducted by the Urban Affairs Committee of the Nebraska Legislature (Committee) in 1976 and 1977, and by housing studies conducted in Nebraska from 1971 through 1978.

A 1976 study of declining neighborhoods, commissioned by the Committee as part of its inquiry into housing conditions in Nebraska, found substantial interest by local officials, lenders, and realtors in the creation of a housing finance agency or some other mechanism that would use public funds to make mortgage loans available to lower income persons.

Other studies by governmental agencies in Nebraska have emphasized the adverse effect of the housing crisis on persons of low and moderate income. A 1972 Nebraska Housing Advisory Council study entitled "Projection of Housing Needs" contained the following statistical analysis:

| Total Number of Housing Units Needed by 1980 | |
| --- | --- |
| Per Population Growth | 45,428 Units |
| Per Housing Replacement | 97,128 Units |
| Per Desired Vacancy | 15,344 Units |
| Total Production Needed by 1980 | 157,900 Units |

Anticipated Production Capacity
(12% of 556,901 Units)                  <u>108,595  Units</u>
Production Deficit                          49,305 Units

According to the testimony, in 1972, 29 percent of persons across the state saw housing deficiencies as a major problem of their local community.

Sixty-three percent of small town manufacturers in Nebraska, when asked to give opinions about their communities, said the availability of suitable housing constituted a problem for their employees and that this problem was likely to increase in the future.

The Department of Economic Development in reports concerning housing in Nebraska identified inflation, income levels, job opportunities, and interest rates as contributing factors in a family's inability to afford housing. The department's reports in 1975, 1976, and 1977 reflected the continuing rapid rate of inflation of housing costs which have made it increasingly difficult for low and moderate income people to afford safe and decent housing.

The State maintains that the Act is unconstitutional for a number of specific reasons. In particular, the State maintains: (1) That the Act creates a single public corporation by special law in violation of Article XII, section 1, of the Constitution of the State of Nebraska; (2) that the Act granted to the Fund special privileges and immunities in violation of Article III, section 18, of the Constitution of the State of Nebraska; (3) that the Act permitted the extension of the credit of the State for a purely private purpose in violation of Article XIII, section 3, of the Constitution of the State of Nebraska; (4) that the Act permitted the issuance of revenue bonds in excess of $100,000 in violation of Article XIII, section 1, of the Constitution of the State of Nebraska; (5) that the Act unconstitutionally limited the people of Nebraska in their right to initiative and referendum as provided in Article III, sections 2 and 3, of the

Constitution of the State of Nebraska; (6) that the Act permitted an unlawful delegation of legislative authority to the Fund in violation of Article II, section 1, of the Constitution of the State of Nebraska; and (7) that the Act did not effect a valid public purpose.

In examining the validity of a legislative act, we must keep in mind the oft-declared rule to the effect that in construing an act of the Legislature all reasonable doubts must be resolved in favor of its constitutionality. Dwyer v. Omaha-Douglas Public Building Commission, 188 Neb. 30, 195 N. W. 2d 236; United Community Services v. The Omaha Nat. Bank, 162 Neb. 786, 77 N. W. 2d 576; Prendergast v. Nelson, 199 Neb. 97, 256 N. W. 2d 657.

While the creation of an entity to aid in the financing of housing for low and moderate income residents of the state is new to Nebraska, it is neither new nor unique in the country and has been adopted by numerous states having constitutional provisions similar to those of our Constitution. The overwhelming majority of jurisdictions considering such legislation have had little difficulty in finding its validity. See, Walker v. Alaska State Mortgage Association, 416 P. 2d 245 (Alaska, 1966); Cremer v. Peoria Housing Authority, 399 Ill. 579, 78 N. E. 2d 276; Maine State Housing Auth. v. Depositors Trust Co., 278 A. 2d 699 (Me., 1971); Massachusetts Housing Finance Agency v. N. E. Merchants National Bank, 356 Mass. 202, 249 N. E. 2d 599; Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N. W. 2d 298; New Jersey Mortgage Finance Agency v. McCrane, 56 N. J. 414, 267 A. 2d 24; Vermont Home Mortgage Credit Agency v. Montpelier National Bank, 128 Vt. 272, 262 A. 2d 445; State ex rel. v. Copenhaver, 153 W. Va. 636, 171 S. E. 2d 545; State ex rel. Warren v. Nusbaum, 59 Wis. 2d 391, 208 N. W. 2d 780; Utah Housing Finance Agency v. Smart, 561 P. 2d 1052 (Utah, 1977). The fact that so many others

may have found such legislation valid does not, in and of itself, compel us to reach a similar conclusion. Nevertheless, the examination made by the various jurisdictions as set out in their opinions is of particular aid to us in reaching our conclusion, and of some persuasion in convincing us as to the real existence of the problem and the need to solve that problem. We are likewise not unmindful of the fact that the Attorney General in contesting the constitutionality of this Act does not, by such action, mean to indicate his disconcern for the problem, but only seeks to exercise his constitutionally imposed duty to determine the Fund's legality before it embarks upon its duties.

We believe an appropriate place to start this examination may be with the State's contention that the Fund is a corporation created in violation of Article XII, section 1, of the Constitution of the State of Nebraska, which reads in pertinent part as follows: "The Legislature shall provide by general law for the organization, regulation, supervision and general control of all corporations * * *. No corporations shall be created by special law * * * except those corporations organized for charitable, educational, penal or reformatory purposes, * * *." The argument is made to us by the State that the Fund is a corporation covered by Article XII, section 1, and therefore in violation thereof. The appellee, on the other hand, argues first that the Fund is not a public corporation but rather a quasi-corporation, and second it was created by a general law and not by a special law so that no violation of Article XII, section 1, of the Constitution occurred. We believe the appellee is correct.

There can be little argument that the state of the law with regard to the distinctions between public corporations, quasi-corporations, and governmental entities in general is at best confused. While the Fund has certain characteristics of a corporation,

including being called a body corporate, it is likewise clear that it lacks most of the characteristics of a corporation, and is designated as an "independent instrumentality exercising essential public functions." § 76-1607, R. S. Supp., 1978. An examination of the Act makes it clear that regardless of what name may be ascribed to the Fund, it is in some manner a governmental body. To begin with, the Act itself in several places talks about the need to create "a governmental body." §§ 76-1604 and 76-1605, R. S. Supp., 1978. Moreover, three of the nine members are ex officio members solely and wholely by reason of holding other state positions. § 76-1607, R. S. Supp., 1978. It seems to us that the Legislature could not compel the Director of Economic Development to be the chairman of the Fund unless the entity was a governmental body related to state government over which the Legislature had some control.

We need not, however, add to the confusion by attempting to isolate the species to which the Fund belongs. Regardless of its class, we find that it was created by a general law and not a special law. Therefore, regardless of how it is characterized, as a public corporation or as a quasi-public corporation, it is a governmental body created by general law which is not in violation of Article XII, section 1, of the Constitution of the State of Nebraska.

"An act is general, and not special or local, if it operates alike on all persons or localities of a class, or who are brought within the relations and circumstances provided for, if the classification so adopted by the legislature has a basis in reason, and is not purely arbitrary. * * * 'If a law affects equally all persons who come within its operation it cannot be local or special within the meaning of the Constitution.' * * * 'A law is not local or special in a constitutional sense that operates in the same manner upon all persons in like circumstances.' 'General

laws are those which relate to or bind all within the jurisdiction of the law-making power, and if a law is general and operates uniformly and equally upon all brought within the relation and circumstance for which it provides it is not a local or special law in the constitutional sense.' " Bauer v. State Game, Forestation and Parks Commission, 138 Neb. 436, 293 N. W. 282; State v. Stuht, 52 Neb. 209, 71 N. W. 941; State, ex rel. Johnson, v. Consumers Public Power District, 143 Neb. 753, 10 N. W. 2d 784.

There is little dispute that the housing needs of low and moderate income citizens of this state exist all across the state and not just in one isolated area. All persons of low or moderate income needing assistance in obtaining financing for housing will be eligible to benefit from this Act, and all will equally receive the benefits of the Act. In every sense the Act applies generally over the entire class and not specially for an isolated group or area.

The State points to the majority opinion in Wittler v. Baumgartner, 180 Neb. 446, 144 N. W. 2d 62, in support of its position that the Act is special legislation in violation of Article XII, section 1, of the Constitution of the State of Nebraska. It is true this court did hold in Wittler v. Baumgartner, *supra*, that the creation of a grid system corporation violated Article XII, section 1, because it created a public corporation by special law. The dissenting opinion in Wittler, however, called our attention to the fact that the court's finding with regard to Article XII, section 1, was extreme and broke with settled definitions of general and special laws. We believe that the minority in Wittler was correct with regard to its analysis of general laws and special laws. The Legislature may very well determine that a legitimate public purpose can be accomplished by creating a single entity to handle the matter. To the extent that Wittler is in conflict with our decision herein as it relates to Article XII, section 1, of the Constitution

of the State of Nebraska, it is overruled.

In answering the question of whether the Act is a general law or a special law, we find that it is a general law. The more important question, however, is whether the Act accomplishes a public purpose. We believe it does.

While, as already noted, we have not heretofore passed upon the constitutionality of the Act, we nevertheless have had a previous opportunity to pass upon what constitutes a public purpose and in particular what constitutes a public purpose with regard to housing. In the case of Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W. 451, we examined the constitutionality of the act creating the Housing Authority of the City of Omaha. In the course of that opinion we discussed "public purposes," saying: "Plaintiffs contend that the legislation before us was not enacted for a public purpose. In enacting the legislation, the legislature made certain findings to the effect that conditions existed relative to slum clearance and low income housing which required the establishment of sanitary and wholesome housing projects in cities of the metropolitan class with a view of promoting health and sanitation and preventing the spread of crime and disease. The findings of the legislature, while not absolutely controlling, are entitled to great weight. It is obvious that the legislation was passed in the exercise of the police power of the state to protect the health, safety, morals and general welfare of its people. We think that these objectives subserve a public purpose and as such are proper subjects for legislative action. Many states have enacted similar laws and we are impressed with the unanimity with which they have been upheld as being for a public purpose." The fact that the public purpose sought to be eliminated in Lennox v. Housing Authority of City of Omaha, *supra*, was slum clearance and the public purpose sought to be

fulfilled in the instant case is the providing of adequate housing for low and moderate income persons is of no significant difference. It simply reflects the changing times and a society more mindful and concerned with the needs of its citizens.

This was most ably pointed out by the Minnesota Supreme Court in passing upon the constitutionality of their mortgage financing act when they said: " 'The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. Such a taking as here proposed could not possibly have been thought a taking for public use at the time of the adoption of our Constitution when the state was practically a wilderness without a single city worthy of the name. The term "public use" is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution.' * * *." Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N. W. 2d 298.

We are persuaded by the reasoning of the Utah Supreme Court in the case of Utah Housing Finance Agency v. Smart, 561 P. 2d 1052 (Utah, 1977), wherein they said: "The matter of a serious shortgage of safe, sanitary, decent housing for a large segment of the citizenry falls squarely within the police power of the legislature to deal with the health, safety, and morals of the populace. Courts which have discussed the matter indicate numerous ways in which making decent housing more readily available beneficially affects the health, safety and morals of the public. * * * It cannot be said that the finding of the legislature that a public purpose is served by increasing the availability of financing for construction, purchase, and rehabilitation of low and moderate income housing, is incorrect or unreasonable on its face."

What is a public purpose is primarily for the Leg-

islature to determine. A public purpose has for its objective the promotion of the public health, safety, morals, security, prosperity, contentment, and the general welfare of all the inhabitants. No hard and fast rule can be laid down for determining whether a proposed expenditure of public funds is valid as devoted to a public use or purpose. Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare. United Community Services v. The Omaha Nat. Bank, 162 Neb. 786, 77 N. W. 2d 576. It is the province of the Legislature to determine matters of policy and appropriate the public funds. If there is reason for doubt or argument as to whether the purpose for which the appropriation is made is a public or a private purpose, and reasonable men might differ in regard to it, it is essentially held that the matter is for the Legislature. Power Oil Co. v. Cochran, 138 Neb. 827, 295 N. W. 805.

It requires little evidence and less imagination to realize the effect upon communities and the state generally when housing is inadequate and substandard. The lack of adequate housing underlies many of the problems suffered by a state. Inadequate housing is but the harbinger of poor health, increased crime, and general community unrest. It ultimately leads to economic depression within a community and destroys the incentive to succeed. It is within a state's right and is a public purpose to attempt to save the now almost lost but nevertheless worthwhile dream that a family may have a decent, clean, and adequate home they can call their own. Not only is this goal morally right, but from the standpoint of good government it is essential. Once clean, sanitary, and adequate housing disappears, the costs for crime prevention and rehabilitation, for health protection, and for public welfare increase. All citizens are then called upon to bear the cost of

combating the evils which are inevitable in the absence of good, adequate, clean, and financially possible housing. Nothing could be more of a public purpose.

In State ex rel. Warren v. Nusbaum, 59 Wis. 2d 391, 208 N. W. 2d 780, the Wisconsin Supreme Court said: " '. . . The rule that the benefits to the public must be direct and not remote and that the past course or usage of government is to be resorted to for guidance must in each case be considered in the light of the principle that the legislature has a very wide discretion to determine what constitutes a public purpose, and that courts will not interfere unless at first blush the act appears to be so obviously designed in all its principal parts to benefit private persons and so indirectly or remotely to affect the public interest that it constitutes the taking of property of the taxpayers for private use. It is to be observed that the tendency of later cases is toward greater liberality in characterizing taxes or appropriations as public in purpose, doubtless in recognition of the fact, as was stated in Laughlin v. City of Portland, *supra* [111 Me. 486, 90 A. 318], that:

" 'Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual efforts may vary. . . . On the one hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. . . . Its two tests are: First, the subject matter, or commodity, must be one "of public necessity, convenience or welfare." . . . The second test is the difficulty which individuals have in providing it for themselves.' "

Our Legislature has found and declared that there exists a serious shortage of adequate housing which can be financed by low and moderate income people. We have no reason to doubt that declaration nor to ignore its public purpose.

The fact that certain of the funds once obtained through bonds may go to private lending institutions who in turn will make the funds available for low and moderate income citizens does not change the public purpose for which the funds are intended. The vital point in all such disbursements is whether the purpose is public. If it is, it does not matter whether the agency through which it is dispensed is public or not. How the funds are disbursed is not the critical issue, but rather whether the object for which it serves is a public purpose. The test is in the end result, not in the means. See United Community Services v. The Omaha Nat. Bank, *supra*. A law may serve the public interest although it benefits certain individuals or classes more than others. John R. Grubb, Inc. v. Iowa Housing Finance, 255 N. W. 2d 89 (Iowa, 1977).

In examining this very issue, the North Carolina Supreme Court in Martin v. Housing Corp., 277 N. C. 29, 175 S. E. 2d 665, observed: "Unquestionably, when construction of residential housing is made possible by the Corporation's assistance, all persons in the building industry benefit from such construction. Such benefit is similar to that which results from the construction of any public project, e.g., public buildings, school buildings, highways, etc. Too, the 'persons and families of lower income' who will occupy such residential housing as owners or tenants will benefit from the existence and availability thereof. Although these benefits will flow from the Corporation's authorized activities, its raison d'etre, the reason and justification for its existence, is to make available decent, safe and sanitary housing to 'persons and families of lower income' who cannot otherwise obtain such housing accommodations. The General Assembly, with good reason, was fully aware that the acquisition of homes by 'persons and families of lower income' gives them a stake in the preservation of our so-

ciety. Nothing could contribute more to the stability of our institutions than the acquisition of homes by an ever-increasing proportion of our people."

While the Legislature may not, under the guise of public purpose, pass a law solely for the benefit of a selective few, the facts in this case should demonstrate the vast statewide benefit to be obtained. The benefits, if any, to be realized by the building industry are only incidental benefits obtained by providing adequate housing for citizens of the state. It seems difficult to understand how it could be legally permissible to provide welfare payments for housing to low income families, but legally impermissible to aid in providing private financing to the same people so that they could acquire adequate housing with dignity. We believe that the overall intent and purpose of the Act is clearly a public purpose and in no manner violates Article XII, section 1, of the Constitution of the State of Nebraska.

It is further contended by the State that the Act violates Article XIII, section 3, of the Constitution of the State of Nebraska, which provides: "The credit of the state shall never be given or loaned in aid of any individual, association, or corporation * * *." The Act does not, however, violate Article XIII, section 3, because the credit of the state is not in any manner being given or loaned in aid of any individual. Only the Fund is involved. It is the Fund which acquires the monies through the sale of bonds, and it is the Fund which repays the bonds through revenue it acquires. If there is insufficient revenue with which to repay the bonds, the state in no manner becomes obligated or liable. The Act specifically provides that the bonds may not be a debt, liability, or general obligation of the state, and must contain on the face thereof a statement that neither the faith and credit nor the taxing power of the state is pledged to the payment of the principal of or the interest on such bonds. § 76-1630, R. S. Supp., 1978.

The Act could not be clearer that the credit of the state is not being given or loaned in any manner.

A similar argument was made in the attack against the Minnesota Housing Finance Act. In rejecting the claim on a similar constitutional provision, the Minnesota Supreme Court in Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155, 210 N. W. 2d 298, said: "Our attention has not been called to any case directly involving this issue so far as the issuance of bonds of the state or its immediate agency are concerned. However, in actions involving the University and other governmental subdivisions, we have applied the rule that bonds do not constitute a 'debt' if they are to be paid solely out of earnings or income. * * * Other states have consistently held that revenue bonds which specifically deny any liability of the state do not constitute state debt within the meaning of provisions similar to Minn. Const. art. 9, ss. 6 and 7. Walker v. Alaska State Mtge. Assn. 416 P. 2d 245 (Alaska, 1966); New Jersey Mtge. Finance Agency v. McCrane, 56 N. J. 414, 423, 267 A. 2d 24, 29 (1970); Martin v. North Carolina Housing Corp., 277 N. C. 29, 53, 175 S. E. 2d 665, 679 (1970); Maine State Housing Authority v. Depositors Trust Co., 278 A. 2d 699, 706 (Maine, 1971). *. * *'' We accordingly hold that the issuance of the bonds and the repayment thereof, as provided under the Act, do not constitute an extension of the credit of the state in violation of Article XIII, section 3, of the Constitution of the State of Nebraska.

The State further maintains that the Act permits the state to incur indebtedness in excess of $100,000 in violation of Article XIII, section 1, of the Constitution of the State of Nebraska. We likewise reject that argument because we do not believe the state is in any manner incurring a debt within the meaning of Article XIII, section 1. The bonds are repaid out of the revenue derived by the Fund. No state appropriation, revenue, or tax is used to repay the

bonds. It is clearly within what is recognized as the "Special Fund Doctrine." The special fund doctrine appears to have had its origin in a case where the construction of a waterworks system by a municipality was financed by obligations payable only from revenue derived from the operation of the system. Winston v. Spokane, 12 Wash. 524, 41 P. 888. The court in that case held such a plan was not subject to a constitutional limitation upon indebtedness because there was no liability upon the city to pay the debt out of its general funds. This court has likewise held the special fund doctrine applicable to the improvement of a light plant in Carr v. Fenstermacher, 119 Neb. 172, 228 N. W. 114, and to the construction of a toll bridge in Kirby v. Omaha Bridge Commission, 127 Neb. 382, 255 N. W. 776. Likewise, see, State ex rel. Meyer v. Steen, 183 Neb. 297, 160 N. W. 2d 164; State ex rel. Meyer v. Duxbury, 183 Neb. 302, 160 N. W. 2d 88. There are no state funds involved in the repayment of any debt contemplated by the Act, and the proceeds clearly fall within the special fund doctrine which thereby takes the matter out of Article XIII, section 1. The Act does not violate Article XIII, section 1, of the Constitution of Nebraska.

The State likewise maintains that the Act is in violation of the state Constitution in that it impermissibly restricts the discretion of future Legislatures to revise, amend, or repeal the Act. Section 76-1646, R. S. Supp., 1978, provides in effect that the state pledges to and agrees with the holders of any bonds that it will not change the law insofar as the outstanding bonds are concerned. This section of the Act does not in any manner restrict the Legislature from changing the law with regard to the future. It simply prevents them from changing the law with regard to contracts already made.

While the statutory language may be thought necessary to provide comfort to potential investors, the

law is clear that even in the absence of a section similar to section 76-1646, R. S. Supp., 1978, the Legislature could not change the law insofar as it applies to existing bond obligations. Article I, section 16, of the Constitution of the State of Nebraska, forbids and makes ineffective any law impairing the obligation of contracts. A statute may not operate retroactively where it would impair the obligation of a contract or interfere with a vested right. State v. Haberman, 191 Neb. 127, 214 N. W. 2d 266; Dell v. City of Lincoln, 170 Neb. 176, 102 N. W. 2d 62.

In view of the fact the Act does nothing more than the Constitution of Nebraska requires, it cannot be said that the Act in any manner impermissibly restricts the discretion of future Legislatures to revise, amend, or repeal the Act as to future matters.

It is further contended by the State that the Act is unconstitutional in that it results in the impermissible delegation of powers reserved to the Legislature in violation of Article II, section 1, of the Constitution of the State of Nebraska. While it is true we held that the Legislature, in creating an administrative body, cannot delegate power which is conferred solely upon the Legislature, in Terry Carpenter, Inc. v. Nebraska Liquor Control Com., 175 Neb. 26, 120 N. W. 2d 374, we have likewise said that a legislative enactment may properly confer general powers upon an administrative agency and delegate to the agency the power to make rules and regulations covering the details of the legislative purpose. Board of Regents v. County of Lancaster, 154 Neb. 398, 48 N. W. 2d 221. The exercise of a legislatively delegated authority to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation or enforcement of a law with clearly designated limitations and standards, is not an exercise of legislative power. State v. Cutright, 193 Neb. 303, 226 N. W. 2d 771; Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W.

451. In the instant case, the legislation establishes clearly the intent and purpose of the Act and the general limitations imposed thereon. The Fund is simply authorized to promulgate rules and regulations sufficient to carry out the declared purposes. The limitations of those rules are, however, clear under the Act. As we have previously indicated, such delegation is not unlawful. Here the Legislature has not delegated to the Fund any authority vested in the Legislature, but merely the authority to promulgate regulations to determine how and in what manner the purpose proclaimed by the Legislature shall be fulfilled.

The question of how far the Legislature should go in filling in the details of the standards which an administrative agency is to apply raises large issues of policy in which the Legislature has a wide discretion, and the court should be reluctant to interfere with such discretion. Such standards in conferring discretionary power upon an administrative agency must be reasonably adequate, sufficient, and definite for the guidance of the agency in the exercise of the power conferred upon it and must also be sufficient to enable those affected to know their rights and obligations. 1 Am. Jur. 2d, Administrative Law, § 117, p. 923. The modern tendency is to be more liberal in permitting grants of discretion to an administrative agency in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases. 1 Am. Jur. 2d, Administrative Law, § 118, p. 925. This is particularly true where, as here, the violation of any such regulation does not constitute a criminal act. We do not believe the authority granted the Fund by the Legislature is an unlawful delegation of powers reserved to the Legislature.

Finally, the State argues that the Act grants to the Fund special privileges and immunities in violation of Article III, section 18, of the Constitution of the

State of Nebraska. In the first instance, as already noted, the Act applies equally to all persons within the class. Such action is permissible if the classification is based upon some reasonable basis. City of Plattsmouth v. Nebraska Telephone Co., 80 Neb. 460, 114 N. W. 588. Certainly, as pointed out above, the classification is reasonable.

We have many times said that the power of classification rests with the Legislature and cannot be interfered with by the courts unless it is clearly apparent the Legislature has by artificial and baseless classification attempted to evade and violate provisions of the Constitution prohibiting local and special legislation. Dwyer v. Omaha-Douglas Public Building Commission, 188 Neb. 30, 195 N. W. 2d 236; City of Scottsbluff v. Tiemann, 185 Neb. 256, 175 N. W. 2d 74.

Statutes which are reasonably designed to protect the health, morals, and general welfare do not violate the Constitution where they operate uniformly on all within a class which is reasonable. This is so even if a statute grants special or exclusive privileges where the primary purpose of the grant is not the private benefit of the grantees but the promotion of the public interest. State ex rel. Meyer v. Knutson, 178 Neb. 375, 133 N. W. 2d 577. The Act does not impermissibly grant to the Fund privileges, immunities, or exclusive franchises because of classification. The classification is constitutionally reasonable and proper.

With regard to the matter of exempting the property of the Fund from taxation, having already determined the Fund is a form of governmental subdivision, it follows that its property is exempt from taxation as a matter of law. Article VIII, section 2, of the Nebraska Constitution, provides that the property of the state and its governmental subdivisions shall be exempt from taxation.

In Lennox v. Housing Authority of City of Omaha,

*supra,* we said: "We are obliged to hold that a housing authority, created and operated under the legislation before us, is a governmental subdivision within the purview of the Constitution, and consequently its property and bonds are legally exempted from taxation." Exempting the Fund's property from taxation therefore is not an impermissible grant of a privilege, immunity, or exclusive franchise.

Likewise, setting out the manner of issuing its bonds and exempting the bonds from other statutory provisions is not impermissible. The Act is merely attempting to be complete in itself. Such decision by the Legislature under the circumstances is valid. No part of the Act therefore violates Article III, section 18, of the Nebraska Constitution.

While nothing we can say here is intended to grant to the Legislature carte blanche authority to create whatever they will, the facts in this case meet all the tests applied.

Having therefore examined each and all of the objections raised by the Attorney General, and having determined that none of them cause the Act to be in violation of any provision of the Constitution of the State of Nebraska, we must concur with the trial court and hold that the Nebraska Mortgage Finance Fund is a valid act of the Legislature and in all respects constitutional. The judgment is affirmed.

AFFIRMED.