REQUESTED BY: Senator Curt Bromm Nebraska State Legislature
You have requested our opinion concerning the constitutionality of LB 1176. The legislation proposes to amend the Nebraska Public Safety Wireless Communication System Act, Neb. Rev. Stat. §§ 86-401 to 86-419
(Cum. Supp. 2002) [the "Act"]. The Act, as originally enacted in 2002 by the passage of LB 1211, provides a mechanism for the establishment of a statewide public safety communication system. To establish such a system, the Act permits the creation of two separate joint entities. The first joint entity is an "acquisition agency" established pursuant to the Interlocal Cooperation Act. Neb. Rev. Stat. §§ 86-404 and 86-410(1) (Cum. Supp. 2002).[1] The "acquisition agency" is empowered "to acquire real and personal property for use in connection with such system and shall construct any facilities necessary to implement such system. . . ." Neb. Rev. Stat. § 86-410(1) (Cum. Supp. 2002). The second joint entity is an "alliance" formed under the Interlocal Cooperation Act. Neb. Rev. Stat. §§ 86-405 and 86-410(2) (Cum. Supp. 2002). The "alliance" is authorized "to operate, maintain, and manage the system." Neb. Rev. Stat. § 86-410(2) (Cum. Supp. 2002). The Act provides that the alliance is governed by an executive board consisting of no more than nine voting members. Neb. Rev. Stat. § 86-412 (Cum. Supp. 2002). Three members are "appointed by the Governor to represent the State of Nebraska, on behalf of the Department of Administrative Services, the Game and Parks Commission, and the Board of Regents of the University of Nebraska." Id. "One such member may be a director of homeland security in Nebraska." Id. The remaining members of the executive board consist of: (1) "Two members selected by the Governor in consultation with municipalities to represent participating cities and villages"; (2) "Two members selected by the Governor in consultation with counties to represent participating counties"; (3) "One member selected by the Governor in consultation with public power districts to represent participating public power districts"; and (4) "One member selected by the Governor in consultation with fire protection districts to represent participating fire protection districts." Id. The history of the Act indicates that state officials were not authorized to participate as parties to an agreement to form an acquisition agency due to concern that State participation as part of an acquisition agency could violate the limit on State indebtedness in Neb. Const. art. XIII, § 1, because an acquisition agency was authorized to engage in debt financing through the issuance of bonds. Committee Records on LB 1211, 97th Leg., 2nd Sess. 11-13, 16-18 (February 4, 2002); Floor Debate on LB 1211, 97th Leg., 2nd Sess., 11000, 11010 (March 6, 2002).
[1] The Interlocal Cooperation Act is found at Neb. Rev. Stat. §§ 13-801 to 13-827 (1997 and Cum. Supp. 2002).
LB 1176 proposes to alter the mechanism for establishing and operating a statewide public safety communication system by eliminating the separate "acquisition agency" and "alliance" structure enacted by LB 1211, and instead creating a single entity, the Statewide Communication Authority of Nebraska [the "Authority"], empowered to "acquire real and personal property for use in connection with the system, construct any facilities necessary to implement the system, and operate, maintain, and manage the system." LB 1176, §§ 11, 13. The Authority would be "created as a separate governmental subdivision and body corporate and politic, not a state agency, but an independent instrumentality exercising essential public functions." LB 1176, § 13. The Authority would be governed by a nine-member governing board [the "Board"] composed of the following: (1) "Three members appointed by the Governor to represent the State of Nebraska on behalf of the Department of Administrative Services, state public safety agencies, and the Board of Regents of the University of Nebraska . . ."; (2) Two members selected by the Governor in consultation with municipalities to represent participating cities and villages . . ."; (3) "Two members selected by the Governor in consultation with counties to represent participating counties . . ."; (4) "One member selected by the Governor in consultation with public power districts to represent participating public power districts . . ."; and (5) "One member selected by the Governor in consultation with fire protection districts to represent participating fire protection districts." LB 1176, § 15. Appointees currently serving on the board of the alliance established under LB 1211 [the Statewide Communications Alliance of Nebraska, or "SCAN"] "shall be designated as the initial board of the authority unless and until replaced by subsequent gubernatorial appointment." Id.
Section 14 of LB 1176 outlines the powers granted the Authority, including the power to: (1) "Design, acquire, construct, maintain, operate, improve, remove, and reconstruct, so long as its corporate existence continues, the system . . . "; (2) "Enter into operational service agreements with public safety agencies for use of the system . . ."; (3) "Levy a public safety communications charge upon the consumption of electricity . . . "; and (4) "Incur debt, issue bonds and notes, and provide for the rights of the holders thereof, and pledge and apply to the payment of such bonds and notes the proceeds from the public safety communications charge and other receipts, income, revenue, profits, and money of the authority. . . ." LB 1176, § 14.[2] The Authority may issue revenue bonds "payable exclusively from all or a portion of the revenue from service agreements with public safety agencies or from its revenue generally, including proceeds from the charge [on electrical consumers] . . .," or "general obligation bonds. . . ." LB 1176, §§ 20 and 21. As an alternative to issuing revenue or general obligation bonds "for financing public safety communications projects, the authority may enter into a financing agreement with the Nebraska Investment Finance Authority for such purposes." Id. Section 23 of LB 1176 provides:
The bonds shall not be a debt of any political subdivision or public entity, other than the authority, or of this state, and neither this state nor any other political subdivision or public entity shall be liable thereon. Bonds shall be payable only out of any funds or properties of the authority pledged therefor. Such limitations shall be plainly stated upon the face of the bonds.
The question you have asked us to address is whether the establishment of a single, statewide authority under LB 1176, whose governing body is appointed by the Governor and includes members who are representatives of the State, and which is granted the power to issue bonds and incur debt to finance its operations, authorizes the creation of State indebtedness in excess of the limit contained in Neb. Const. art. XIII, § 1?
Art. XIII, § 1, provides, in pertinent part: "The state may, to meet casual deficits, or failure in the revenue, contract debts never to exceed in the aggregate one hundred thousand dollars, and no greater indebtedness shall be incurred. . . ."[3] The debt limitation in art. XIII, § 1, pertains only to debts of the State or its agencies, and is not applicable to political subdivisions or public entities authorized by statute. See Hallenbeck v. Hahn, 2 Neb. 377, 399 (1872) (Constitutional limit on state indebtedness in predecessor to art. XIII, § 1, not applicable to counties, cities, or other political subdivisions of State), overruled on other grounds Johnson v. Hahn,4 Neb. 139 (1875). On two occasions, the Nebraska Supreme Court has found that legislation authorizing State agencies to issue bonds secured by revenues generated from fees and charges collected by the agencies or their assets authorized indebtedness in excess of the limit in art. XIII, § 1. State ex rel. Meyer v. Steen, 183 Neb. 207, 160 N.W.2d 164
(1968); State ex rel. Meyer v. Duxbury, 183 Neb. 302, 160 N.W.2d 88
(1968). The Court in Duxbury noted the significance of the fact that the debt financing in question involved a State agency, stating: "It is important to note that the commission is an agency of the state and not a separate corporation. This results in the commission being subject to constitutional requirements and restrictions that would not be applicable to a separate corporation." 183 Neb. at 303, 160 N.W.2d at 91.
LB 1176 creates the Authority "as a separate governmental subdivision and body corporate and politic, not a state agency, but an independent instrumentality exercising essential public functions." LB 1176, § 13. As a governmental subdivision and body corporate and politic separate and apart from the State, we believe the Authority would not be subject to the debt limitation in art. XIII, § 1.
The proposed legislation further reinforces the Authority's status as a governmental instrumentality independent of the State by confirming that the State will not be liable for any debts of the Authority, providing that any Authority bonds "shall not be a debt of any political subdivision or public entity, other than the authority, or of this state, and neither this state nor any other political subdivision or public entity shall be liable thereon . . .," and that any bonds issued by the Authority "shall be payable only out of any funds or properties of the authority pledged therefor." LB 1176, § 23. The bill further provides that "[s]uch limitations shall be plainly stated upon the face of the bonds." Id.
An issue could arise as to whether the power granted the governing Board of the Authority to impose a charge on electrical consumers throughout the State supports concluding that the Authority, while denominated an independent governmental subdivision and separate body corporate and politic, is in actuality an instrumentality of the State. In view of the organizational structure of the Authority, which demonstrates it is not subject to the control or direction of State officials or agencies, and the Legislature's specific declaration that the Authority is a governmental body independent of the State, whose bonds shall not be a debt of the State, the Authority should not be considered an arm of the State subject to the debt limit in art. XIII, § 1.
Your question also demonstrates concern as to whether the Legislature may create a single governmental subdivision and body corporate and politic to carry out the purpose of establishing a statewide public safety communication system. In Wittler v. Baumgartner,180 Neb. 446, 144 N.W.2d 62 (1966), the Nebraska Supreme Court held a legislative act establishing a public corporation and political subdivision comprising a "grid system" created a corporation by "special law" prohibited by Neb. Const. art. XII, § 1. The Court found the legislation was an unconstitutional attempt "to create a public corporation by a special act rather than by general law." Id. at 454,144 N.W.2d at 68. This holding in Wittler was expressly overruled in State ex rel. Douglas v. Nebraska Mortgage Finance Fund, 204 Neb. 445,283 N.W.2d 12 (1979) ["Mortgage Finance Fund"]. The Court in Nebraska Mortgage Finance Fund held that "[t]he Legislature may well determine that a legitimate public purpose can be accomplished by creating a single entity to handle the matter. To the extent that Wittler is in conflict with our decision, . . ., it is overruled." Id. at 456, 144 N.W.2d at 20. In light of the decision in Mortgage Finance Fund, it appears there is no constitutional impediment to creation of the Authority as a single independent governmental subdivision and body corporate and politic authorized to establish the statewide public safety communication system.
Another issue presented by your question involves whether granting the Governor power to appoint members of the Authority's governing Board may render the Authority a State agency or entity subject to the debt limits in art. XIII, § 1. The proposed Board includes nine members appointed by the Governor, three of which are State representatives. The other six members, while appointed by the Governor, represent various local government authorities, including counties, cities, fire protection districts, and public power districts. LB 1176, § 15. The Board is thus not subject to control by the State or any State agency, as a majority of the Board's members are appointed to represent local government entities. This fact reinforces the notion that the Authority is not an agency or instrumentality of the State. See New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 69 A.2d 875 (1949) (Rejecting argument that granting Governor authority to appoint members of Turnpike Authority, statutorily deemed a "body corporate and politic," rendered the Turnpike Authority "the alter ego of the State government" subject to New Jersey state constitutional debt limit).
In sum, to the extent the Authority is deemed an independent governmental subdivision and body corporate and politic separate and apart from the State, the
Authority's use of debt financing does not implicate the constitutional debt limitation in Neb. Const. art. XIII, § 1, as the limit applies only to State indebtedness.
Sincerely,
 JON BRUNING Attorney General
 L. Jay Bartel Assistant Attorney General
Approved:
__________________________ Attorney General
pc: Patrick O'Donnell Clerk of the Legislature
[2] By resolution of the Board, the Authority is empowered to levy a charge on consumers of electrical service "in an amount not to exceed fifty cents per month for each residential customer and two dollars per month for each nonresidential customer." LB 1176, § 20.
[3] The Constitutional provision does provide certain exceptions to the debt limitation, none of which have any application to the question presented.