STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS, ATTORNEY GENERAL, RELATOR, v. CHARLES THONE, GOVERNOR OF THE STATE OF NEBRASKA, ET AL., RESPONDENTS.

286 N. W. 2d 249

Filed December 4, 1979. No. 42863.

Paul L. Douglas, Attorney General, Robert F. Bartle & Paul E. Hofmeister, for relator.

Nelson & Harding, Brian K. Ridenour, Steven P.

Denton & John H. Heen, and Carl T. Curtis, Richard N. Thompson & Loel D. Brooks, for respondents.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This is an original action commenced by the State of Nebraska on the relation of the Attorney General, against Charles Thone, Governor of the State of Nebraska, and Larry Bare, Director of the Department of Economic Development of the State of Nebraska, the purpose of which is to enjoin the Governor and Director from attempting to implement the provisions of L.B. 571, Laws 1979, which became operative June 1, 1979. L.B. 571 authorizes a plan for the development of alcohol plants and facilities in the State of Nebraska. The petition alleges the act is unconstitutional in several respects and that the respondents, unless enjoined from so doing, will implement the act. The parties have agreed to a stipulation of facts which demonstrates that a justiciable issue exists.

This court, on July 20, 1979, entered an order temporarily enjoining the Governor from entering into any agreement with any party for the construction of an alcohol plant and from expending or authorizing the expenditure of revenue or public funds collected under the provisions of L.B. 571 for the purpose of constructing or guaranteeing the construction of alcohol plants. That order did not enjoin the collection of additional gasoline tax as provided for in L.B. 571, nor did it enjoin the Governor's preparation and adoption of guidelines and criteria for applications to construct, acquire, and operate plants and facilities.

The purpose and proposed operation of L.B. 571 may be described as follows. L.B. 571 contains a plan for the construction of plants and facilities for the manufacture of alcohol. Although L.B. 571 does

not specifically so state, it is evident from other legislation adopted at the same legislative session, to wit, L.B. 74, and from the stipulated facts that the manufacture of "agricultural ethyl alcohol" is contemplated. The purpose is the promotion of the use of "gasohol," a motor fuel consisting of a blend of gasoline with 10 percent ethyl alcohol, 190 proof, produced in Nebraska. § 66-821, R. S. Supp., 1979.

The act authorizes the state to enter into agreements with counties and municipalities, or any combination thereof (hereinafter municipality), to build or otherwise provide for and operate such plants. The statute contemplates that the agreement between the state and the municipality will include a lease of the plant to the state for a term not to exceed 50 years, for rental periods of 12 months or less. Section 6 of the act provides in part: "All such leases shall be subject to the condition that there is in effect a yearly appropriation for the payment of any rentals and other sums due and payable on the first day of each rental period, and in the event that there is no yearly appropriation the lease terminates." § 66-826, R. S. Supp., 1979. When all payments called for by the agreement have been made, the state may exercise "any option to purchase" contained in the agreement. § 66-829, R. S. Supp., 1979. The state may sublease the plant, or the state and the municipality may enter into a management service contract with any person for the operation of the plant.

All profits, as defined by the act, from the operation of the plant are required to be paid into an "Alcohol Plant Fund," hereinafter APF. This fund will be described in more detail later in this opinion.

To provide funds for the construction or other acquisition of the plant and facilities and to provide working capital, a municipality, which is a party to an agreement with the state, is authorized to issue and sell bonds and to pledge the revenue "of any

such municipality or county" for those purposes. § 66-829, R. S. Supp., 1979. Revenue is not defined by the act. The term might be construed to not be limited to operational profits, for the latter are required to be paid into the APF, which is a state fund. However, it is not necessary for us to decide that question.

The act also grants to the municipality for the purpose of carrying out the purposes of the act the powers described in section 72-1403, R. R. S. 1943, a part of the state office building act. The powers so granted include the issuance of ". . . its general obligation bonds in the manner and pursuant to the procedures as are otherwise provided by law, or in anticipation of the receipt by such municipality of any payments to be made by the state to such municipality for the supplying by the municipality to the state of such building or facility, or portions thereof, or in anticipation of the receipt of any other revenue with respect to the building or facility, including donations, to issue its revenue bonds in the manner and pursuant to the procedures as are otherwise provided by law and to secure such revenue bonds by a pledge of any or all of the revenue or other money to be derived by the municipality from its ownership or operation of such building or facility, including any payments to be made to such municipality by the state for the use by the state of such building or facility, . . . ."

Section 72-1403, R. R. S. 1943, provides that such bonds are not obligations of the state and provides that each bond "shall recite therein in substance that such bond is solely the obligation of the municipality issuing the same and is not an obligation of the State of Nebraska nor a debt of the State of Nebraska within the meaning of any constitutional or statutory limitation upon the creation of indebtedness of the State of Nebraska and that the State of Nebraska is not, and in no event shall be, liable for

the payment thereof or interest thereon."

Section 8 of the act describes the APF. That fund comes from three sources: First, as already noted, profits, if any, from the operation of the plant. Second, a 1-cent per gallon increase in gasoline tax.[1] Third, such funds as may be appropriated by the Legislature. Section 8 further provides: "The Alcohol Plant Fund shall be used to make lease payments, if necessary, in an amount sufficient to pay the principal of, interest on, and premium, if any, on the bonds issued pursuant to this act to finance alcohol plants and to maintain amounts in any bond and bond reserve funds." § 66-828, R. S. Supp., 1979. The money derived from the increase in gasoline tax is placed in the APF "only when calls or demands are made on such fund pursuant to lease agreements entered into under this act." § 39-2215, R. S. Supp., 1979. The Governor is authorized to use any amounts in the APF not utilized to make lease payments to retire by purchase bonds issued by the municipality under the act. § 39-2215, R. S. Supp., 1979.

Section 20 of the act provides that the powers conferred upon the municipality "shall be in addition and supplemental to the powers conferred by any other law and shall be independent of and in addition to any other provision of the laws of the State of Nebraska with reference to the matters covered by this act." § 66-840, R. S. Supp., 1979.

We find it necessary to address only three of the issues raised by the parties. They are: (1) Whether the act authorizes the expenditure of public funds for other than a public purpose purportedly in violation of Article XIII, section 3, and Article III, section 18, of the Nebraska Constitution. (2) Whether im-

---

[1] See § 2 of the act which amends § 39-2215, R. R. S. 1943; § 3 which amends § 66-410, R. S. Supp., 1978; § 4 which amends § 66-428, R. S. Supp., 1978; and § 5 which amends § 66-605, R. S. Supp., 1978.

plementation of the bond financing provisions of the act authorizes the state to incur a debt in excess of the amount permitted by Article XIII, section 1, of the Nebraska Constitution. Related to issue (2) is the contention of the respondents that there is no debt because funds to be placed in the APF are presently appropriated. (3) Whether, if the act is unconstitutional, the provision for the addition of a 1-cent per gallon gasoline tax is severable and valid even though the balance of the act is void.

We find: (1) The purposes of the act are public and not in violation of any constitutional provision. (2) The act in effect authorizes the state to guarantee payment of the bonds authorized to be issued by section 9 of the act and violates Article XIII, section 1, of the Nebraska Constitution. (3) The act evidences a legislative intention that the added 1-cent gasoline tax is severable and may stand alone.

## PUBLIC PURPOSE

The arguments of the relator that the act authorizes expenditures of public funds for private purposes is founded upon the premises: (1) The act contains no declaration of public purpose. (2) The act authorizes the expenditure of tax funds for development of a particular industry which traditionally has been one engaged in only by private enterprise. (3) It enables the state to become a competitor of private enterprise. (4) It authorizes public funds to be used for the aid of private corporations and individuals, to wit, those who might be engaged as operators of the plants and facilities for compensation.

The relator recognizes that the Constitution of Nebraska contains no express provision against expending funds for essentially private purposes, but rather is grounded on "the fundamental concepts of our constitutional system." State ex rel. Beck v. City of York, 164 Neb. 223, 82 N. W. 2d 269; Oxnard Beet Sugar Co. v. State, 73 Neb. 66, 105 N. W. 716.

Relator also cites Chase v. County of Douglas, 195 Neb. 838, 241 N. W. 2d 334.

The principles which must guide this court in the determination of whether the act contemplates a public purpose are these: "It is for the Legislature to decide in the first instance what is and what is not a public purpose, but its determination is not conclusive on the courts. However, to justify a court in declaring a tax invalid because it is not for a public purpose, the absence of public purpose must be so clear and palpable as to be immediately perceptible to the reasonable mind." Chase v. County of Douglas, *supra*.

"What is a public purpose is primarily for the Legislature to determine. A public purpose has for its objective the promotion of the public health, safety, morals, security, prosperity, contentment, and the general welfare of all the inhabitants. No hard and fast rule can be laid down for determining whether a proposed expenditure of public funds is valid as devoted to a public use or purpose. Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare." State ex rel. Douglas v. Nebraska Mortgage Finance Fund, *ante* p. 445, 283 N. W. 2d 12.

"It is the province of the Legislature to determine matters of policy and appropriate the public funds. If there is reason for doubt or argument as to whether the purpose for which the appropriation is made is a public or a private purpose, and reasonable men might differ in regard to it, it is essentially held that the matter is for the Legislature." State ex rel. Douglas v. Nebraska Mortgage Finance Fund, *supra*.

Additional guidance on what may or may not be considered a public purpose is to be found in the opinions of this court extending over a long period of time where the question has been considered. Ex-

amples of improper expenditure of public funds for private purpose include the following: Oxnard Beet Sugar Co. v. State, *supra* (bounty paid directly to growers of sugar beets); State ex rel. Beck v. City of York, *supra* (the financing of specific private enterprises with public funds).

Examples of expenditures for public purposes include: State v. Cornell, 53 Neb. 556, 74 N. W. 59 (issuance of bonds to enable counties to participate in state expositions and fairs); Fisher v. Board of Regents, 108 Neb. 666, 189 N. W. 161 (scientific research to aid in the protection and preservation of food, including the manufacture and sale of hog cholera serum); Standard Oil Co. v. City of Lincoln, 114 Neb. 243, 207 N. W. 172 (provision in city home rule charter allowing city to engage in the business of selling gasoline, held, under conditions then existing, not to violate the Nebraska Constitution as not being a public purpose); Chase v. County of Douglas, *supra* (expenditures for publicity and advertising to promote the general growth and industry even where the expenditures are made through the chamber of commerce); State ex rel. Douglas v. Nebraska Mortgage Finance Fund, *supra* (creation of a corporation to raise money through the sale of revenue bonds, proceeds of which are to be used to loan money to lending institutions and to purchase mortgages from them, all for the purpose of encouraging low-cost housing).

In the case before us, the legislative history of the act as well as the stipulated facts indicate the public purpose appears to be founded upon the current energy shortage and a need to promote the use of agricultural products by converting them to alcohol. The Legislature appears also to have found that private industry has not evidenced any intention of meeting the public need as perceived by the Legislature.

·We have been cited no authority which holds that

any legislative act calling for the expenditure of public funds need contain an express declaration of public purpose. We hold there is no such requirement.

An examination of the cases which we have earlier cited seems to dispel the relator's other contentions. Competition with private industry does not in and of itself make the expenditure one for a private purpose. The fact that the plants and facilities may be managed by private corporations or individuals under management contracts does not make the purpose private. This is clearly a case in which the court cannot say the legislative determination of public purpose is incorrect.

THE CONSTITUTIONAL LIMITATION ON DEBT

Article XIII, section 1, of the Nebraska Constitution, provides in part: "The state may, to meet casual deficits, or failures in the revenue, contract debts never to exceed in the aggregate one hundred thousand dollars, and no greater indebtedness shall be incurred except . . . ." The exceptions need not be enumerated since none are applicable to the question before us.

It is stipulated by the parties to this litigation that implementation of a project contemplated by the act will require, in one or more instances, the issuance of bonds in an amount in excess of $100,000, under section 9 of the act.

The constitutional validity of an act of the Legislature is to be tested and determined, not necessarily by what has been done or possibly may be done under it, but by what the statute authorizes to be done under and by virtue of its provisions. United Community Services v. The Omaha Nat. Bank, 162 Neb. 786, 77 N. W. 2d 576; State ex rel. Rogers v. Swanson, 192 Neb. 125, 219 N. W. 2d 726.

The issue is whether the provision of section 8 of the act earlier quoted and repeated here authorizes the contraction of debt or the incurrence of an in-

debtedness within the meaning of Article XIII, section 1, of the Nebraska Constitution. "The Alcohol Plant Fund shall be used to make lease payments, if necessary, in an amount sufficient to pay the principal of, interest on, and premium, if any, on the bonds issued pursuant to this act to finance alcohol plants and to maintain amounts in any bond and bond reserve funds." § 66-828, R. S. Supp., 1979.

The plain and evident purpose of the quoted portion of section 8 is to assure that if profits from the operation of the plants and facilities are insufficient to pay the bonds, the state will pay them either from the 1-cent gasoline tax, or from other future appropriations made by the Legislature, or from both such sources. The respondents concede the object of that provision is to commit the state to guaranteeing payment of the bonds. We quote from their brief: "The second tier of the financing mechanism involves the establishment of a fund to assure the payment of the bonds. As a back-up to the revenues generated from operation of the alcohol plants and related facilities financed by the issuance of bonds, the Act authorizes the collection of certain moneys to in effect guarantee such bonds." The obvious reason for such guarantee is to assure the marketability of the bonds. No underwriter or investor would be likely to buy the bonds if required to rely solely upon the profitability of a particular venture and a lien upon the physical assets.

The state is not to be the primary obligor on the bonds. However, previous opinions of this court, as well as the opinions of other courts which have had occasion to consider the question, make it very clear that even though the obligation of the state may be secondary or contingent, the obligation is nonetheless a debt within the meaning of Article XIII, section 1, Nebraska Constitution. State ex rel. Meyer v. Duxbury, 183 Neb. 302, 160 N. W. 88; Ruge v. State, 201 Neb. 391, 267 N. W. 2d 748; Rochlin v.

State, 112 Ariz. 171, 540 P. 2d 643.  See, also, Austin
v. Healy, 376 Ill. 633, 35 N. E. 2d 78; Hubbell v. Her-
ring, 216 Iowa 728, 249 N. W. 430.

In State ex rel. Meyer v. Duxbury, *supra*, the Leg-
islature created a commission to issue bonds, the
proceeds of which were then to be loaned to cities to
finance waste water treatment facilities.  The cities
in turn were to issue to the commission their own
bonds, payable from anticipated revenue.  This
court, in holding the financing plan created a state
debt in violation of the Constitution, said:  "But the
act involved here authorizes a pledge of more than
municipal bonds to secure the payment of the bonds
issued by the commission.  The act provides that the
commission may pledge all or any part of the fees
and charges to be received by the commission and
all or any part of the assets of the commission as se-
curity for the payment of the bonds and notes issued
by the commission.  The act also provides that the
commission may establish debt service reserve
funds, to secure the payment of its bonds, and that
the Legislature may appropriate supplemental funds
from the general revenue fund of the state to supply
any deficiency so that the debt service reserve funds
may be maintained at the full amount prescribed in
the act.  The act further provides that:  'It shall be
the policy of the state and it does hereby pledge and
agree that, to the extent appropriations may be
made from state funds for the limited purposes here-
in indicated, the provisions hereof are intended as
compensation to the commission as an agent of the
state for the accomplishment of a state govern-
mental purpose.' "

In Ruge v. State, *supra*, the court held constitu-
tional the principal parts of a financing plan for the
acquisition of a state office building in Omaha, to be
built by the city and financed in part through means
of a lease by the city to the state.  In that case, the
lease was cancelable at the will of the Legislature,

and the act expressly provided the state had no binding obligation beyond the current year's rent.

In the same case, however, we held unconstitutional a provision of the lease authorizing the state to pay liquidated damages upon termination of the lease, saying that such provision contravened the debt provision of the Constitution. We there said: "In Section 28 of the lease the lessee agrees to pay to the lessor, upon termination of the lease, as liquidated damages for the default by the lessee: '* * * the reasonable costs incurred by Lessor in reletting the Land and the Public Facility and the reasonable costs of alterations incurred by Lessor in reletting the same, or the reasonable costs to Lessor necessary to place the Land and the Public Facility, or either of them, in condition for reletting, which costs shall be paid by Lessee to Lessor upon notice to Lessee that such reletting has been accomplished or such alterations have been completed, as the case may be, and of the amount of the costs thereof.' Under this provision the state assumes a liability of an undetermined amount, for which no appropriation has been made, and which will be payable, if at all, at some undetermined time in the future." Ruge v. State, *supra*.

In Rochlin v. State, *supra*, the Supreme Court of Arizona had occasion to succinctly point out that secondary or contingent liabilities are debt. It said: "Under Section 5 of Article 9, a debt can be either direct or contingent. A direct debt occurs when the State borrows money, pledging its credit as the sole source of payment. A contingent or secondary debt occurs when the governmental unit guarantees payment of revenue bonds, pledging its credit in the event that the revenues derived from the funded project prove inadequate to meet the bond obligations." Article 9, section 5, of the Arizona Constitution is, apart from the exceptions, substantially

the same as Article XIII, section 1, of the Nebraska Constitution.

In State ex rel. Meyer v. Steen, 183 Neb. 297, 160 N. W. 2d 164, we said: "One purpose of the constitutional limitation upon state indebtedness is to prevent the anticipation of revenue by the creation of obligations to be paid from revenue to be received in future fiscal periods. Art. XIII, § 1, Constitution of Nebraska. . . . Obligations which are to be paid from revenue subject to appropriation by future Legislatures are subject to the state debt limitation provision." See, also, Ruge v. State, *supra*; State ex rel. Meyer v. Duxbury, *supra*.

Even though the special fund doctrine might be said to be applicable to the portion of the APF coming from profits, that fact does not obviate the debt limitation problem. In this state the special fund doctrine is not applicable to obligations payable from excise taxes or other revenue subject to the control of the Legislature and available for any legal use. State ex rel. Meyer v. Steen, *supra*.

It is clear the act purports to permit the state to guarantee unlimited payment of the bonds from excise taxes and other revenue subject to the control of the Legislature and available for any legal use. What the Legislature sought to do by the legislation found unconstitutional in Duxbury and in Ruge cannot in principle be distinguished from the case before us. The principles announced in those cases govern this one. L.B. 571 violates both the letter and the spirit of Article XIII, section 1, of the Nebraska Constitution, and is therefore in part, at least, unconstitutional and void.

As will be noted from our previous summary of the act, it provides two separate avenues for the issuance of bonds, one being section 9 and the other that which incorporates the provisions of section 72-1403, R. R. S. 1943. In the latter case, the statute contains an express provision that: ". . . the State

of Nebraska is not, and in no event shall be, liable for the payment thereof or interest thereon." There is no such limitation pertaining to bonds issued under section 9. The two methods are clearly alternatives. See section 20 of the act.

However, this does not solve the constitutional problem so far as the incorporation of section 72-1403, R. R. S. 1943, is concerned. If the bonds are issued under section 9, it is clear that section 8 commits the state to pay the bonds if the municipality does not. It is not absolutely clear from the terms of the act that such obligation exists if the bonds are issued under section 72-1403, R. R. S. 1943.

The act can be read as incorporating only the provisions of section 72-1403, R. R. S. 1943, which grant powers, and not incorporating the restrictions negativing the state obligation. If read in this way, then the same constitutional objections exist in the case of bonds issued under section 9. It seems absolutely clear, however, that the powers under section 72-1403, R. R. S. 1943, would not have been granted without the guarantee under section 8. For the reasons later discussed in the immediately following section of this opinion titled Severability, the provisions incorporating section 72-1403, R. R. S. 1943, must therefore fall if section 8 does.

We must briefly take note of the respondent's contention that the act does not violate the debt limitation provision because the APF has already been appropriated. The contention is patently frivolous. Respondents simply want to change the definition of the term, presently appropriated. The general rule is that an obligation for which an appropriation is made at the time of its creation from funds already in existence, or for which definite provision has been made, is not within the operation of a limitation of indebtedness provision. 72 Am. Jur. 2d, States, Etc., § 81, p. 474. However, a declaration of the Legislature of the purpose for which money will or may

in the future be expended is not an appropriation. Stahmer v. State, 192 Neb. 63, 218 N. W. 2d 893; Ruge v. State, 201 Neb. 391, 267 N. W. 2d 748. No amounts are designated in the act. Even the amount of the prospective obligations are not known since they have not yet been incurred or even estimated. They cannot be known until bonds are issued. There are no profits subject to appropriation for there is no certainty there will be any profits.

One of the elements of the APF is "such funds as *may be* appropriated by the Legislature." (Emphasis supplied.) § 66-828, R. S. Supp., 1979. With reference to the part of the fund to come from the 1-cent gasoline tax, it is to be noted that it remains in the Highway Trust Fund until "calls or demands are made on such fund pursuant to lease agreements entered into under this act." § 39-2215, R. S. Supp., 1979. That section also provides that any part not used either for the APF or to pay highway bonds is to be transferred monthly to the "Highway Allocation Fund, established by section 39-2401, for such use as may be provided by law." It is plain there is no present appropriation or any appropriation at all in the sense in which that term is used in Article III, section 22, of the Nebraska Constitution.

SEVERABILITY

The act contains the following severability clause: "If any section in this act or any part of any section shall be declared invalid or unconstitutional, such declaration shall not affect the validity or constitutionality of the remaining portions thereof." L.B. 571, Laws 1979, § 22.

The rules are: A severance clause creates a presumption that, eliminating the invalid parts, the Legislature would have been satisfied with what remains. Such a clause, however, is merely an aid to interpretation and not an inexorable command. Moeller, McPherrin & Judd v. Smith, 127 Neb. 424, 255 N. W. 551. When the invalid portions of a statute

are so interwoven with the rest of the act so that the act may not be operative with the void portions eliminated or where it is obvious from an inspection of the act that the invalid portion formed the inducement for the passage of the act, the entire act fails. City of Scottsbluff v. Tiemann, 185 Neb. 256, 175 N. W. 2d 74.

The declaration of severability cannot, with the exception dealt with later in this opinion, save the act. It is apparent from the act itself as well as its legislative history that the provisions guaranteeing bond payments through the utilization of state revenues are the very heart of the plan. Without this guarantee it is doubtful the act would have passed.

THE ONE-CENT GASOLINE TAX PROVISION

Can the amendments to sections 66-428 and 66-605, R. S. Supp., 1978, increasing the fuels excise tax 1 cent, stand even though the balance of the act is unconstitutional? This, to our mind, presents a very close question. Plausible arguments can be advanced to support both affirmative and negative answers. Those arguments supporting the negative are analogous to those already discussed.

The arguments supporting severance are these. The fuel tax is a revenue-producing measure which existed wholly apart from L.B. 571. The increase in tax provided by L.B. 571 is initially placed in the Highway Trust Fund, along with the remainder of the tax, and is to be transferred to the APF only if necessary to make lease payments. Further, L.B. 571 contemplates, by the express terms of section 39-2215, R. R. S. 1943, that any part of the increase unused shall be transferred monthly to the Highway Allocation Fund. Section 39-2215, R. R. S. 1943, also provides that it may be used for any other lawful purpose.

Such uses are wholly independent and separate from the objectives of L.B. 571. It is also significant that the Legislature contemplated there be sources

other than the excise tax to guarantee bond payments, viz., such other funds as may be appropriated by the Legislature. Under these circumstances, the legislative expression of severability is entitled to considerable weight. We think the doubt should be resolved in favor of severance. On the purely pragmatic level, it is to be observed that, if we have mistaken the legislative intent on this item, the Legislature may simply repeal the increase.

JUDGMENT FOR THE RELATOR IN
ACCORDANCE WITH THIS OPINION.