REQUESTED BY: Senator Ernest Chambers State Capitol Lincoln, NE 68509
Dear Senator Chambers:
This is in response to your inquiry of February 11, 1985, concerning LB 72.
While your letter merely asks if we agree with the propositions set forth therein, the body of the letter is prefaced as follows:
 Re: Whether wagering on sporting events as authorized by LB 72 violates Article III, section 24 of the Constitution of Nebraska?
We are therefore treating it as a request for an opinion in that regard.
Article III, section 24 provides as follows:
 The Legislature shall not authorize any game of chance, nor any lottery, or gift enterprise where the consideration for a chance to participate involves the payment of money for the purchase of property, services, chance or admission ticket, or requires an expenditure of substantial effort or time; Provided, that it may authorize and regulate other lotteries, raffles, and gift enterprises which are intended solely as business promotions or the proceeds of which are to be used solely for charitable or community betterment purposes without profit to the promoter of such lotteries, raffles, or gift enterprises. Nothing in this section shall be construed to prohibit the enactment of laws providing for the licensing and regulation of wagering on the results of horse races by the parimutuel or certificate the parimutuel or certificate licensees within the race track enclosure at licensed horse race meetings, or to prohibit the enactment of laws providing for the licensing and regulation of bingo games conducted by nonprofit associations which have been in existence for a period of five years immediately preceding the application for license; Provided, bingo games cannot be conducted by agents or lessees of such associations on a percentage basis. (Amended, 1934, 1958, 1962, 1968.)
The crux of the issue here revolves around the question of whether or not the Legislature, by LB 72, would `authorize games of chance' by authorizing wagering on sporting events. If so, it is in violation of the above constitutional provision.
We generally agree with your statement that `Sporting events are not games of chance;'. There may be some exceptions. We would also generally agree with you that the winners of the contests are usually not determined by the luck of the draw, selection by lot, or other such devices, but we cannot agree that the wagers are not determined by chance in many cases.
While some courts have approved (there are also cases contra), in the absence of an express statute or constitutional provision, betting upon games or sporting events such as horse racing, (where parimutuel betting was not involved), baseball, and others which were considered to involve predominantly skill rather than chance, see, annotation Games of Chance or Skill, 135 A.L.R. 104 (1941), we are not persuaded that the Nebraska Supreme Court, in light of previous Nebraska opinions, would follow that line of cases.
In State ex rel. Sorenson v. Ak-sar-ben ExpositionCompany, 118 Neb. 851 (1929), the Supreme Court of Nebraska held that the parimutuel system of betting on horse races was a game of chance which the Legislature could not constitutionally authorize. The court placed considerable emphasis on the fact that all of the money bet on a particular horse went into a pool and the bettors did not know at the time of making the bet the exact amount of money they would receive should they hold a winning ticket. To this extent, even though the race itself may have been predominantly a game of skill or sporting event, the betting itself in a common fund became a game of chance or a lottery.
Apparently because of this case, the above provision of the Constitution was amended to include the language `Nothing in this section shall be construed to prohibit the enactment of laws providing for the licensing and regulation of wagering on the results of horse races by the parimutuel or certificate method, when conducted by licensees within the race track enclosure at licensed horse race meetings.'
Following said amendment, the Attorney General brought an action against a number of establishments in the city of Omaha charging that they were willfully violating the statutory and constitutional provisions of the State of Nebraska prohibiting gambling, betting, and operating unlawful horse race betting establishments and gambling rooms. In said case, State ex rel. Hunter v. The Araho, 137 Neb. 389,289 N.W.2d 545 (1940), the case was submitted on a stipulation of facts. The stipulation set out that a national news service gathered news pertaining to the weather conditions, conditions of the track, race track odds on various horses prior to each race, final results of races at all of the various race tracks throughout the United States, and transmitted such information by telegraph to various subscribers including each of the establishments named as defendants and simultaneously received by each of them as per contract; that the public generally was invited to enter such establishments to place bets with the defendants on horse races being held daily in various places outside the State of Nebraska and in the United States and in other countries; that race horse forms and scratch sheets were provided, and black boards, charts, and other paraphernalia were in such places of business, and that all information of every kind concerning the horses and races, and the results thereof, were given to the patrons.
It was further stipulated that losses and winnings of the patrons were wholely dependent upon the chance outcome of the horses participating in each race, and the selection made by the patrons, and the bets of money made pursuant to such selections.
It was further stipulated that none of said establishments were conducted in or located within any race track enclosure at licensed race meetings in the State of Nebraska.
While not in the facts one way or the other or discussed by the court, it is presumed that the parimutuel method was not being followed as it would have been virtually impossible to do so on race tracks throughout the country and in foreign counties by the bettors participating in the establishments in Omaha, Nebraska.
The Supreme Court reviewed the wording of the Constitution in 1929 in the case of State v. Ak-sar-ben ExpositionCompany, mentioned above, and the fact that the Constitution was amended because the court had held that the parimutuel system of betting on race horses was `a game of chance, a lottery, likewise gambling, and unlawful under the Constitution.'
In the Araho case, the defendants insisted that the amendment declared a new policy in the state with reference to betting on horse races and had the effect of repealing the existing statutes with reference to horse race betting, and rendered former court decisions, holding that such betting constituted a game of chance and a lottery, of no effect. The Supreme Court of Nebraska stated:
 In our opinion, nothing in the amendment to the Constitution of Nebraska, or in the laws passed to carry said change into effect, supports the contention of the defendants that the bars are now down on all forms of games of chance, betting, and gambling in connection with horse races or any kind, wherever held.
The court went on to perpetually enjoin the defendants from permitting or allowing the illegal betting or gambling to the carried on as discussed above.
It should be noted that the court made no particular distinction in that case between `gambling,' `betting,' and `games of chance.'
It is apparent that the type of gambling being carried on in State ex rel. Hunter v. The Araho could well be practiced under the provisions of LB 72. While this may not be what the drafters of this bill had in mind, it is firmly established that `The constitutional validity of an act of the Legislature is to be tested and determined, not necessarily by what has been done or possibly may be done under it, but by what the statute authorizes to be done under and by virtue of its provisions. State ex rel. Douglas v.Thone, 204 Neb. 836, 845, 286 N.W.2d 249 (1979), see alsoUnited Community Services v. Omaha National Bank, 162 Neb. 786.
There is another perspective to be consider apart from the precedent in the Araho case, as to the question of whether the act of betting, on an admitted game of skill, may nevertheless be a game of chance.
In Baedaro v. Caldwell, 156 Neb. 489, 56 N.W.2d 706
(1953), the Supreme Court of Nebraska determined that a pinball machine was a gambling device. In doing so, the court stated: `The test of the character of the game is not whether it contains an element of chance or an element of skill but which of these is the dominating element that determines the result of the game.'
Thus, a student of the game of baseball may be careful study of the batting averages of a particular team, its success against various types of pitchers, who the pitchers may be in a given game, weather conditions, and a host of other factors, be said to be a `skill' bettor. Other bettors who may bet on the same game may have none of this information or only a vague feeling as to which team is superior. Thus, while the game of baseball may be a game of skill, the persons betting, in many, if not most cases, are dominated by the element of chance in the selection of the team they take. In other words, unless the bettors on a sporting event take the time and trouble to make the proper calculations as to which team to bet on, often within certain odds or point spread established by bookies, the selection is primarily one of chance and not of skill.
It must again be emphasized that the Legislature in LB 72 is authorizing not a sporting event, but the betting on a sporting event. We feel that the Supreme Court of Nebraska would probably hold that in doing so, the Legislature is authorizing a game of chance contrary to the Nebraska Constitution.
We are not unmindful of your statements that the stock market and commodities futures trading are within the definition of gambling yet are not deemed to be `games of chance' prohibited by the Nebraska Constitution.
In this regard, we point out that there have been cases holding various transactions on the stock market and in futures trading to be gambling or games of chance. These have usually involved situations where it can be proved that it is a mere sham and the real intent of the parties is merely to speculate on the rise or fall of the prices and property is not intended to be delivered. It is the generally accepted rule that a contract for the sale of stocks or other commodity to be delivered at a future day is valid, even though the seller has no goods and has no other means of getting them than to go into the market and buy them before the day of delivery, provided the parties really intend that the goods are to be delivered by the seller and the price is to be paid by the buyer. Generally the difficulty in prosecution results from a matter of proof where an actual investment is not involved. This is discussed generally in 38 C.J.S., Gaming Sections 9 et seq.
We do not believe that the Legislature could, under our constitution, authorize speculation for money on the stock market where the parties mutually intended that no buying or selling of stock, or other property, actually occur.
Very truly yours,
A. EUGENE CRUMP Deputy Attorney General
Mel Kammerlohr Assistant Attorney General