CLAIR CALLAN, APPELLANT, v. M. BERRI BALKA, STATE TAX COMMISSIONER, APPELLEE.

536 N.W.2d 47

Filed August 11, 1995. No. S-94-354.

470

Joseph M. Casson for appellant.

Don Stenberg, Attorney General, and L. Steven Grasz for appellee.

Robert T. Grimit and David D. Zwart, of Baylor, Evnen, Curtiss, Grimit & Witt, for amici curiae American Corn Growers Assoc. et al.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ., and BUCKLEY, D.J.

WRIGHT, J.

Clair Callan filed a petition for declaratory and injunctive relief, seeking a determination that the ethanol tax credit provisions of Neb. Rev. Stat. §§ 66-1326 and 66-1329 (Cum. Supp. 1992) are in violation of article XIII, § 3, of the Nebraska Constitution. The district court granted summary judgment, and Callan appeals.

## SCOPE OF REVIEW

The constitutionality of a statute is a question of law, and the Supreme Court is obligated to reach a conclusion independent of the decision reached by the trial court. *State v. Popco, Inc.*, 247 Neb. 440, 528 N.W.2d 281 (1995). The party claiming a statute is unconstitutional has the burden to show and clearly

demonstrate that the questioned statute is unconstitutional. *Id.*

## FACTS

On April 15, 1992, 1992 Neb. Laws, L.B. 754, known as the Ethanol Authority and Development Act, was signed into law. It was codified at Neb. Rev. Stat. §§ 66-1301 through 66-1329 (Cum. Supp. 1992) and later recodified at Neb. Rev. Stat. §§ 66-1330 through 66-1348 (Supp. 1993). Effective September 1, 1993, §§ 66-1326 and 66-1329 were recodified as §§ 66-1344 and 66-1347 (Supp. 1993) pursuant to 1993 Neb. Laws, L.B. 364. Hereinafter, we shall refer to the statutory citations by their current designations.

M. Berri Balka is the duly appointed and acting state Tax Commissioner of the State of Nebraska and is charged with the duty of administering the revenue laws of the state, including provisions of the Ethanol Development Act. The act requires the Nebraska Department of Revenue to adopt and promulgate rules and regulations to provide for the issuance of transferable motor fuel tax credit certificates to ethanol producers in Nebraska and to enter into agreements with ethanol producers on behalf of the State of Nebraska to furnish tax credits to producers as mandated by § 66-1344.

On June 8, 1993, Callan filed a petition in the district court for declaratory judgment and injunctive relief, seeking to permanently enjoin Balka from implementing and administering or enforcing the provisions of §§ 66-1344 and 66-1347. In his answer, Balka denied that the statutes violate Neb. Const. art. XIII, § 3. Balka subsequently filed a motion for summary judgment, and following a hearing, the district court found there was no genuine issue of material fact that §§ 66-1344 and 66-1347 serve a valid public purpose and do not violate Neb. Const. art. XIII, § 3. The court dismissed Callan's petition.

The section of the Nebraska Constitution, article XIII, § 3, under which this action is brought provides:

> The credit of the state shall never be given or loaned in aid of any individual, association, or corporation, except that the state may guarantee or make long-term, low-interest loans to Nebraska residents seeking adult or post high school education at any public or private

institution in this state. Qualifications for and the repayment of such loans shall be as prescribed by the Legislature.

The statutes alleged to be unconstitutional provided as follows:

(1) Each producer of ethanol shall receive a credit pursuant to this section of twenty cents per gallon of ethanol produced in Nebraska, which credit shall be in the form of a transferable motor fuel tax credit certificate. After July 1, 1994, no such credit shall be given for ethanol produced at an ethanol facility which was in production on or before January 1, 1992, unless on or before July 1, 1994, the name plate design capacity for the production of ethanol, before denaturing, at the facility has been expanded to equal at least two times the name plate design capacity for production of ethanol, before denaturing, existing at the facility as of January 1, 1992.

(2) Any ethanol facility which is in production at the rate of at least twenty-five percent of its name plate design capacity for the production of ethanol, before denaturing, on or before December 31, 1992, shall receive a credit of twenty cents per gallon of ethanol produced beginning with the first month for which it is eligible to receive such credit and ending not later than December 31, 1997.

(3) Any ethanol facility which is not in production on or before December 31, 1992, but which is in production at the rate of at least twenty-five percent of its name plate design capacity for the production of ethanol, before denaturing, on or before December 31, 1995, shall receive a credit of twenty cents per gallon of ethanol produced for sixty months beginning with the first month for which it is eligible to receive such credit and ending not later than December 31, 2000.

(4) Any ethanol facility eligible for a credit under subsection (1), (2), or (3) of this section shall also receive a credit of twenty cents per gallon of ethanol produced in excess of the original name plate design capacity which results from expansion of the facility completed on or before December 31, 1995. Such credit shall be for sixty

months beginning with the first month for which production from the expanded facility is eligible to receive such credit and ending not later than December 31, 2000.

(5) The credit shall be given only for ethanol produced at a plant in Nebraska at which all fermentation, distillation, and dehydration takes place. Not less than two million gallons and not more than twenty-five million gallons of ethanol produced annually at an ethanol facility shall be eligible for the credit, and the credit may only be claimed by a producer for the period specified in subsection (2), (3), or (4) of this section.

(6) The Department of Revenue shall prescribe an application form and procedures for claiming the credit and shall adopt and promulgate rules and regulations to carry out this section.

§ 66-1344.

(1) There is hereby created the Ethanol Production Incentive Cash Fund which shall be used by the board to pay the credits created in section 66-1344 to the extent provided in this section. Any money in the fund available for investment shall be invested by the state investment officer pursuant to sections 72-1237 to 72-1276. On or before September 1, 1993, the State Treasurer shall transfer to the Ethanol Production Incentive Cash Fund the entire balance of the Ethanol Authority and Development Cash Fund and thereafter shall transfer such additional money as shall be (a) appropriated to the Ethanol Production Incentive Cash Fund by the Legislature, (b) given as gifts, bequests, grants, or other contributions to the Ethanol Production Incentive Cash Fund from public or private sources, (c) made available due to failure to fulfill conditional requirements pursuant to investment agreements entered into prior to April 30, 1992, (d) received as return on investment of the Ethanol Authority and Development Cash Fund, and (e) otherwise credited to the Ethanol Production Incentive Cash Fund from sources deemed appropriate by the Legislature.

(2) Commencing January 1, 1993, the Department of Revenue shall, at the end of each calendar quarter, notify

the State Treasurer of the amount of motor fuel tax that was not collected in the preceding calendar quarter due to the credits provided in section 66-1344. The State Treasurer shall transfer from the Ethanol Production Incentive Cash Fund to the Highway Trust Fund an amount equal to such credits less the following amounts:

(a) For 1993, 1994, and 1995, the amount generated during the calendar quarter by a one-cent tax on motor fuel pursuant to sections 66-489 and 66-605.07;

(b) For 1996, the amount generated during the calendar quarter by a three-quarters-cent tax on motor fuel pursuant to such sections;

(c) For 1997, the amount generated during the calendar quarter by a one-half-cent tax on motor fuel pursuant to such sections; and

(d) For 1998, 1999, and 2000, no reduction.

The amounts shall be transferred through December 31, 2000. For 1993 through 1997, if the amount generated pursuant to subdivisions (a), (b), and (c) of this subsection and the amount transferred pursuant to subsection (1) of this section are not sufficient to fund the credits provided in section 66-1344, then the credits shall be funded through the Ethanol Production Incentive Cash Fund but shall not be funded through either the Highway Cash Fund or the Highway Trust Fund. For 1998, 1999, and 2000, the credits provided in such section shall be funded through the Ethanol Production Incentive Cash Fund but shall not be funded through either the Highway Cash Fund or the Highway Trust Fund.

(3) On February 15, 2001, the State Treasurer shall transfer any unexpended and unobligated funds from the Ethanol Production Incentive Cash Fund to the Highway Trust Fund.

§ 66-1345.

The Tax Commissioner and the producer eligible to receive credit under section 66-1344 shall enter into a written agreement. The producer shall agree to produce ethanol at the designated facility and any expansion thereof. The Tax Commissioner, on behalf of the State of

Nebraska, shall agree to furnish the producer the tax credits as provided by and limited in such section in effect on the date of the agreement. The agreement to produce ethanol in return for the credit shall be sufficient consideration, and the agreement shall be binding upon the state. No credit shall be given to any producer of ethanol which fails to produce ethanol in Nebraska in compliance with the agreement. The agreement shall include:

(1) The name of the producer;

(2) The address of the ethanol facility;

(3) The date of the initial eligibility of the ethanol facility to receive such credits;

(4) The name plate design capacity of the ethanol facility as of the date of its initial eligibility to receive such credits; and

(5) The name plate design capacity which the facility is intended to have after the completion of any proposed expansion. If no expansion is contemplated at the time of the initial agreement, the agreement may be amended to include any proposed expansion.

§ 66-1347.

It is undisputed that Balka, as the Tax Commissioner, has entered into an agreement with one or more ethanol producers located in the State of Nebraska pursuant to §§ 66-1344 and 66-1347 and has issued and continues to issue transferable motor fuel tax credit certificates to ethanol producers.

## ASSIGNMENT OF ERROR

Callan assigns as error the district court's finding that §§ 66-1344 and 66-1347 do not violate Neb. Const. art. XIII, § 3.

## ANALYSIS

### CONSTITUTIONALITY

To establish the unconstitutionality of a legislative act under Neb. Const. art. XIII, § 3, the party must prove that the credit of the state was given or loaned in aid of any individual, association, or corporation. *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991). The constitutionality of a statute is a

question of law, and the Supreme Court is obligated to reach a conclusion independent of the decision reached by the trial court. *State v. Popco, Inc.*, 247 Neb. 440, 528 N.W.2d 281 (1995).

In *Haman*, the Legislature, as a response to the losses to depositors because of the failure of the Nebraska Depository Institution Guaranty Corporation, a private corporation, enacted 1990 Neb. Laws, L.B. 272A. This law authorized the Department of Banking and Finance to fulfill the $30,000 guaranty of every depositor of the failed Commonwealth Savings Company. Haman, a nondepositor Nebraska resident taxpayer, sought to have L.B. 272A declared unconstitutional, because, inter alia, it pledged the credit of the state.

We stated that the plaintiff must prove three elements: (1) The credit of the state (2) was given or loaned (3) in aid of any individual, association, or corporation. We also stated that the purpose of article XIII, § 3, is to prevent the state or any of its governmental subdivisions from extending the state's credit to private enterprise, citing *United Community Services v. The Omaha Nat. Bank*, 162 Neb. 786, 77 N.W.2d 576 (1956). "It is designed to prohibit the state from acting as a surety or guarantor of the debt of another." *Haman*, 237 Neb. at 718, 467 N.W.2d at 850. We noted that the first question involving the statute was whether it involved the "credit of the state." "The state's credit is inherently the power to levy taxes and involves the obligation of its general fund." *Id.* at 719, 467 N.W.2d at 850. In noting the distinction between the loaning of state funds and the loaning of the state's credit, we stated that a loan of state funds places the state in the position of a creditor, and the loan of credit places the state in the position of a debtor. Since L.B. 272A made the state forever liable for the losses of industrial company depositors and obligated present and future taxes from the state's general fund contrary to article XIII, § 3, we found the statute unconstitutional. See *Haman, supra.*

In contrast to *Haman*, *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979), upheld the constitutionality of a fund which assisted private mortgage lenders in providing mortgage financing for single–family residences at reduced rates. The mortgage fund

acquired the money through bond sales and was responsible for the payment of those bonds. We held the fund was constitutional because the credit of the state was not being given or loaned in aid of any individual and only the fund was involved. The fund acquired moneys through the sale of bonds, and it repaid the bonds through revenue it acquired. In the event there was insufficient revenue with which to repay the bonds, the state in no manner became obligated or liable. The act provided the bonds would not be a debt, liability, or general obligation of the state.

Here, we examine § 66–1344 to determine whether it involves a credit of the state which is given or loaned to ethanol producers. The affidavit of Janet A. Stege, administrator of the motor fuels division of the Nebraska Department of Revenue, provides a background and procedure for the ethanol tax credit program.

### STEGE'S AFFIDAVIT

Stege's affidavit recites that the Ethanol Production Incentive Cash Fund (EPICF), created by § 66–1345, was initially funded by a transfer of $11 million from the Ethanol Authority and Development Cash Fund. The Ethanol Authority and Development Cash Fund was funded by a checkoff program on grain sold in Nebraska. Additional moneys are transferred into the EPICF pursuant to statute from money which may be appropriated by the Legislature; money received as gifts, bequests, grants, or other contributions from public or private sources; money made available due to failure to fulfill conditional requirements pursuant to investment agreements entered into prior to April 30, 1992; money received as return on investment of the fund; and money otherwise credited to the fund from sources deemed appropriate by the Legislature. § 66–1345(1).

Stege stated that in January 1993, it became the duty of the Department of Revenue at the end of each calendar quarter to notify the State Treasurer of the amount of the motor fuel tax that was not collected in the preceding calendar quarter due to the ethanol tax credits provided by § 66–1344. The State Treasurer is then directed to transfer from the EPICF to the

Highway Trust Fund an amount equal to the credits less the amounts mandated in § 66–1345(2).

As of September 1, 1993, the EPICF's balance was $16,746,500. No general fund moneys have been appropriated to the EPICF since its inception. The ethanol tax credits cannot be funded from either the Highway Cash Fund or the Highway Trust Fund. Under §§ 66–1344 and 66–1347, upon meeting certain conditions, the ethanol producer is eligible to receive a credit of 20 cents per gallon of ethanol produced in Nebraska. The credit is given only for ethanol produced at a plant in Nebraska at which all fermentation, distillation, and dehydration take place. A producer receives credit for all qualified gallons for 60 months beginning with the first month for which the producer is eligible. Credits will not be granted after December 31, 2000. The credit is in the form of a transferable motor fuel tax credit certificate, which an ethanol producer can then transfer to any individual or entity which is responsible for paying motor fuel taxes under Nebraska law, Stege stated.

Stege's affidavit provided an example of the ethanol tax credit program. If an ethanol producer produces 1 million gallons per month, the producer submits to the department a form indicating the amount of qualified production in the previous month. Based on production of 1 million gallons and a credit of 20 cents per gallon, a credit of $200,000 is applied to the producer. The ethanol producer designates a company or individual to which the $200,000 in motor fuel tax credits shall be assigned. Typically, the credits are assigned to an "oil jobber" to reduce the oil jobber's motor fuel tax liability. If the oil jobber's monthly fuel tax is less than $200,000, the credit can be carried over until it is depleted. The jobber, in a private and separate transaction, remits to the ethanol producer a check for $200,000 less any negotiated fee. The State of Nebraska does not enter into any surety or guarantee agreement with respect to the issuance of the credits. Stege estimated that sales of gasoline containing the oxygenate ethanol composed 47 percent of all gasoline sold in Nebraska in 1992.

## CALLAN'S ARGUMENT

Callan argues that the transferable motor fuel tax credits

create an obligation assumed by the state to forgo the collection of motor fuel taxes which have already been levied. He claims that by issuing the tax credits, the state is in the position of a debtor and that the payment of the subsidy is the making of a loan to private enterprise. He argues the credit is dispensed to offset the collection of levied motor fuel taxes, and the credits reduce the taxes otherwise dedicated to the Highway Cash Fund and Highway Trust Fund.

According to Callan, the definition of the term "credit of the state" includes a " 'loan of money' " as well as " 'the creation of a debt of the state, either direct or contingent.' " Reply brief for appellant at 9. He claims that the subsidy authorized by §§ 66–1344 and 66–1347, as well as the fund transfer mandated by § 66–1345, constitutes a direct debt of the state given to private enterprise without valuable consideration. The debt is paid by forgoing the collection of levied motor fuel taxes which are otherwise due to the state.

## DEBTOR OR CREDITOR

The key question in our determination of the constitutionality of §§ 66–1344 and 66–1347 is whether the state acts as a debtor by extending the state's credit to private corporations, associations, or individuals. In prior cases where the state became a debtor in the interest of private parties, we held the statutes unconstitutional. See, *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991); *Chase v. County of Douglas*, 195 Neb. 838, 241 N.W.2d 334 (1976); *State ex rel. Beck v. City of York*, 164 Neb. 223, 82 N.W.2d 269 (1957).

The ethanol tax credits may be used to pay Nebraska motor fuel taxes. Black's Law Dictionary 403 (6th ed. 1990) defines a debt as "[a] fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future." The motor fuel taxes are fixed and certain obligations to pay money in the present or in the future to the state. Black's further defines a debtor as "[o]ne who owes a debt to another who is called the creditor." *Id.* at 404. It is clear that a taxpayer responsible for paying motor fuel taxes is a debtor to the State of Nebraska and, conversely, that the state is a creditor of the taxpayer. The redemption of the motor fuel tax credit requires

the state to forgo the collection of that portion of the motor fuel tax which is a debt owed to the state. The state is in the position of a creditor excusing the payment of the motor fuel tax by the debtor. The tax credit merely offsets a debt owed to the state. Although the motor fuel taxes collected are reduced because of the ethanol credits, the ethanol tax credit program does not place the state in the position of a debtor or guarantor. Until the state is owed the motor fuel tax, the tax credit cannot be used by the party who has the tax credit. The credit is only redeemable against a debt that is owed by a party to the state. The state forgives an indebtedness, but is never obligated to pay any money or extend a credit of the state. Contrary to Callan's argument, the state does not create or incur an indebtedness. The state always remains a creditor in relation to the motor fuel tax. We therefore conclude that the state is not a debtor, surety, or guarantor of the debt of another with respect to the tax credits authorized by § 66-1344.

Many provisions in the Nebraska Revenue Act of 1967, Neb. Rev. Stat. §§ 77-2701 through 77-27,135.01 (Reissue 1990 & Cum. Supp. 1994), allow taxpayers to decrease their tax liability by the use of various types of credit. See, e.g., §§ 77-2704.12(3), 77-2715.07, and 77-2734.03. See, also, Neb. Rev. Stat. §§ 77-1736.08 and 77-27,188 (Cum. Supp. 1994) and 77-4105 (Reissue 1990). In all these cases, the revenues of the state are reduced from the level at which they would be if the tax credits were not allowed. However, in none of these instances involving tax credits does the state guarantee payment or lend its credit to the transaction. If the issuance of the credits exhausts the EPICF, the state cannot fund the credits from the Highway Trust Fund, the Highway Cash Fund, or otherwise. There is no obligation on the general fund of the state.

It is true that § 66-1345 directs the State Treasurer to transfer money periodically from the EPICF to the Highway Trust Fund in an amount equal to the number of tax credits redeemed, less certain amounts as specified by the statute. Money from a state fund administered by the Nebraska Ethanol Board is transferred to a state fund administered by the Department of Revenue. The Legislature has chosen to

internally reimburse the Department of Revenue for income that was not received through the usual motor fuel tax. The transfer of money from one state agency to another cannot be considered the loaning of the state's credit to private industry. The EPICF does not implicate the credit of the state.

Nor does the fact that the Highway Trust Fund might not be reimbursed if the EPICF is depleted implicate article XIII, § 3. There is no obligation to replace revenue uncollected because of a tax credit. In the case of other tax credits, the Legislature has chosen to allow the income to remain uncollected. In this case, if the ethanol fund is insufficient to replace the lost revenue, the Highway Trust Fund remains unreimbursed. In either case, the state has chosen to forgo the collection of revenue. In neither case is the state a debtor to any party.

A statute is presumed to be constitutional, and all reasonable doubts regarding constitutionality should be resolved in favor of its validity. See *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995). The party asserting the unconstitutionality of a statute has the burden of overcoming this presumption by clearly demonstrating that the statute is unconstitutional. See, *State v. Popco, Inc.*, 247 Neb. 440, 528 N.W.2d 281 (1995); *In re Application A–16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). When a challenged statute is susceptible of more than one reasonable construction, a court uses the construction that will achieve the purposes of the statute and preserve the statute's validity. *Ehlers v. Perry*, 242 Neb. 208, 494 N.W.2d 325 (1993).

Although the amount of motor fuel taxes collected by the state is reduced by the ethanol tax credit program, the state is not placed in the position of a debtor. The tax credit is used to offset a debt owing to the state. The credit of the state is not involved. We find that Callan's arguments are not persuasive. Since Callan has failed to meet the first prong of the *Haman* test, further analysis is unnecessary.

Summary judgment is to be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Tompkins v. Raines*, 247 Neb. 764, 530 N.W.2d 244 (1995). We find that there is no genuine issue as to any material fact as to the constitutionality of the ethanol

tax credit program and that Balka is entitled to a judgment as a matter of law. We therefore affirm the judgment of the district court.

AFFIRMED.

LANPHIER, J., dissenting.

"The credit of the state shall never be given or loaned in aid of any individual, association, or corporation . . . ." Neb. Const. art. XIII, § 3. Relying upon *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991), the main opinion states that to prove a violation of article XIII, § 3, a plaintiff must show that (1) the credit of the state (2) was given or loaned (3) in aid of any individual, association, or corporation. Those joining in the main opinion conclude that the credit of the state was not involved because the state did not become a debtor, surety, or guarantor by issuing motor fuel tax credit certificates. I respectfully dissent. In this case, the credit of the state is being given.

The primary issue is whether by the issuance of motor fuel tax credit certificates the state's credit (i.e., the general fund) becomes obligated. "The state's credit is inherently the power to levy taxes and involves the obligation of its general fund." *Haman v. Marsh*, 237 Neb. at 719, 467 N.W.2d at 850. Article XIII, § 3, seeks to prohibit the obligation of present and future taxes from the state's general fund in aid of private entities. *Haman, supra.*

In holding that the state is not a debtor, surety, or guarantor of the debt of another in this case, those joining in the main opinion assert that the state always remains a creditor in relation to taxpayers holding motor fuel tax credit certificates. The opinion accurately states that the relationship between the state and taxpayers responsible for paying motor fuel taxes is that of a creditor and a debtor. The opinion then states that since the taxpayer does not use the tax credit until the motor fuel taxes are due, the state remains a creditor and never assumes the taxpayer's debt because the tax credit wipes out that debt. The main opinion states the conclusion that the motor fuel tax credits reduce the amount owed the state rather than create a debt that the state owes or guarantees.

However, when the state forgoes the collection of levied

motor fuel taxes, the credit of the state is implicated. Dealers in motor fuel (oil jobbers) must pay taxes on fuel sold. Motor fuel tax liability is a debt owed by the oil jobbers to the state. Qualified ethanol producers receive motor fuel tax credits which they can assign to oil jobbers for a negotiated fee. Collected motor fuel taxes are placed in the Highway Trust Fund. The Highway Trust Fund is then reimbursed from the Ethanol Production Incentive Cash Fund (EPICF) for the amount of lost revenue due to the tax credits. See Neb. Rev. Stat. § 66–1345(2) (Supp. 1993). The fact that the Highway Trust Fund must be reimbursed for the amount of lost revenue undermines the conclusion in the main opinion that the motor fuel tax credits reduce the amount owed the state rather than create a debt that the state owes or guarantees.

The transferable motor fuel tax credit certificates create an obligation assumed by the state to credit the bearer's motor fuel tax liability in an amount equal to the amount of the certificate. The issuance of the tax credit certificates results in a legally enforceable obligation on the part of the state to forgo the collection of motor fuel taxes which have already been levied. The state's guarantee of the tax credit certificates makes them marketable items that ethanol producers are able to transfer for value. The very fact that the state must honor the tax credit certificates when properly presented by a bearer proves that there is a debt. Forgiving an enforceable debt creates income to the benefit of the obligor of that debt. There follows consequently a loss of that same amount to the obligee, here, the state. The definition of income includes the "discharge of indebtedness." Glenn G. Munn, Encyclopedia of Bankers and Finance 459 (8th ed. 1983). In the statutory scheme before us, that income is generated following the state's having committed to suffer that loss. As discussed, that commitment guarantees the negotiability of the certificate. Thus, the credit of the state was given or loaned.

Although the moneys from the general fund have never been used to directly fund the motor fuel tax credits, the general fund can become obligated via the EPICF. The EPICF is funded through appropriations, gifts, return on investment, and money transferred from the Ethanol Authority and Development Cash

Fund. The Ethanol Authority and Development Cash Fund was funded by a checkoff program on grain sold in Nebraska and was the primary source of money in the EPICF. The main opinion states that no general fund moneys have been appropriated to the fund since its inception.

However, the motor fuel tax credits must be funded through the EPICF. § 66-1345(2). One source of funds for the EPICF is appropriations from the general fund. § 66-1345(1)(a). If general fund moneys are appropriated, article XIII, § 3, would be violated.

In *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979), we held a bond fund which assisted private mortgage lenders in providing mortgage financing was constitutional. The general fund was not implicated, and in the event that there was insufficient revenue with which to repay the bonds, the state in no manner became obligated or liable.

In this case, the general fund may become obligated in the event that the EPICF is insufficient to reimburse the Highway Trust Fund for the lost motor fuel taxes.

In order to prove a violation of article XIII, § 3, the plaintiff must show the state's credit was given or loaned in aid of any individual, association, or corporation. The appellee and amici curiae argue that since the ethanol producer credit has for its objective the promotion of public prosperity, health, security, and the general welfare of all the inhabitants of the State of Nebraska, it therefore serves a public purpose. It is true that we have previously held that the expenditure of public funds for building ethanol plants had a public purpose, given the then-current energy crisis and the need to promote the use of agricultural products by converting them to alcohol. See *State ex rel. Douglas v. Thone*, 204 Neb. 836, 286 N.W.2d 249 (1979).

However, in *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991), we rejected an argument that public purpose necessarily saved a statute which violated the prohibition against the giving or lending of the state's credit where the pledge benefits a private individual, association, or corporation. We stated that

▄▄▄▄▄▄ ▬

> [t]he prohibition against the pledge of the state's credit does not hinge on whether the legislation achieves a "public purpose" when the pledge benefits a private individual, association, or corporation. *McGuffey v. Hall*, 557 S.W.2d 401 (Ky. 1977). The key is whether the state stands as a creditor through the expenditure of public funds or as a debtor by the extension of the state's credit to private corporations, associations, or individuals.

*Haman*, 237 Neb. at 722, 467 N.W.2d at 852.

Therefore, having concluded that the state stands as a debtor by issuing transferable motor fuel tax credit certificates which benefit a private individual, association, or corporation, I would find that the statute is unconstitutional regardless of its public purpose.

The issue is not the benefits of ethanol, but, with apologies to Marshall McLuhan: the method is the message. The issue is whether this court will sanction what is by any other name a raid on the public treasury in violation of the constitutional prohibition against giving or loaning the state's credit for private purposes. If it can be done here, it can be done for any other purpose. The door has been opened.

A method to promiscuously purloin the public purse for private gain has now been judicially sanctioned. The prohibition in article XIII, § 3, of our Constitution has been eviscerated.

CAPORALE and FAHRNBRUCH, JJ., and BUCKLEY, D.J., join in this dissent.